Slip Op. 04-162

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: HONORABLE RICHARD W. GOLDBERG, SENIOR JUDGE

| | |
|---|---|
| U.S. ASSOCIATION OF IMPORTERS OF TEXTILES AND APPAREL,<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES, U.S. DEPARTMENT OF COMMERCE, SECRETARY OF COMMERCE DONALD EVANS, U.S. DEPARTMENT OF STATE, SECRETARY OF STATE COLIN L. POWELL, U.S. DEPARTMENT OF THE TREASURY, SECRETARY OF THE TREASURY JOHN W. SNOW, OFFICE OF THE U.S. TRADE REPRESENTATIVE, U.S. TRADE REPRESENTATIVE ROBERT B. ZOELLICK, U.S. DEPARTMENT OF LABOR, SECRETARY OF LABOR ELAINE L. CHAO, and THE COMMITTEE FOR THE IMPLEMENTATION OF TEXTILE AGREEMENTS,<br><br>          Defendants. | **PUBLIC VERSION**<br><br>Court No. 04-00598 |

[Plaintiff's motion for a preliminary injunction granted.]

Date: December 30, 2004

Brenda Ann Jacobs, David J. Ludlow, and Sharon H. Yuan (Sidley, Austin, Brown & Wood, LLP) for plaintiff U.S. Association of Importers of Textiles and Apparel.

Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and Michael David Panzera, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; John Veroneau and Jason Kearns, Of Counsel, Office of the U.S. Trade Representative; Anne Talbot, Linda Chang, and Ada Bosque, Of Counsel, U.S. Department

of Commerce; <u>Howard M. Radzely</u>, <u>Katherine E. Bissell</u>, and <u>Tambra A. Leonard</u>, Of Counsel, U.S. Department of Labor; <u>William H. Taft, IV</u>, Of Counsel, U.S. Department of State; <u>Arnold I. Havens</u> and <u>John G. Murphy, Jr.</u>, Of Counsel, U.S. Department of the Treasury, for defendant United States.

## OPINION

Before the Court is a Motion for a Preliminary Injunction from plaintiff U.S. Association of Importers of Textiles and Apparel, dated December 1, 2004.  Plaintiff requests that the Court enjoin defendant, during the pendency of this action, from accepting, considering, or taking any further action on requests filed under the procedures issued by the Committee for the Implementation of Textile Agreements ("CITA") in 68 Fed. Reg. 27787 (May 21, 2003) that are based on the <u>threat</u> of market disruption upon the elimination of quotas or safeguards on textile or textile products from the People's Republic of China ("China").  Defendant United States opposes the Motion and also moves to dismiss.[1]  A hearing was held on Monday, December 20, 2004 concerning plaintiff's Motion for a Preliminary Injunction. As conceded by both parties at the hearing and in their briefs, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(i)(3).

## Background

On January 1, 2005, all quotas on the importation of textile and apparel products made in World Trade Organization ("WTO")

---

[1] The Court reserves judgment on defendant's motion to dismiss until briefing on the issues raised therein is complete.

member countries will be eliminated, pursuant to the Uruguay Round Agreements.  See Agreement on Textiles and Clothing ("ATC"), Apr. 15, 1994, Agreement Establishing the World Trade Organization, Annex 1A; see also 19 U.S.C. § 3511 (codifying approval of and general provisions relating to the Uruguay Round Agreements).  Although China is entitled to the benefits of the ATC, under the terms of China's accession to the WTO, the United States may impose temporary textile-specific safeguard measures on Chinese imports of textile and apparel products under certain circumstances ("textile-specific safeguards").  See Protocol on the Accession of the People's Republic of China, § 1.2, WT/L/432 (Nov. 23, 2001); Report of the Working Party on the Accession of China, paras. 241-42, 342, WT/MIN(01)/3 (Nov. 10, 2001) (together "China's Accession Agreement").

On behalf of defendant, CITA has assumed the administration of the textile-specific safeguards based on its general authority to "supervise the implementation of all textile trade agreements."  Exec. Order 11651, 37 Fed. Reg. 4699 (Mar. 3, 1972), as amended by Exec. Order 11951, 42 Fed. Reg. 1453 (Jan. 6, 1977), as further amended by Exec. Order 12188, 45 Fed. Reg. 989 (Jan. 2, 1980); see also 7 U.S.C. § 1854 (delegating authority to executive branch to negotiate agreements with foreign governments limiting the exportation of textiles and textile products to the United States and to promulgate

regulations to carry out such agreements).  CITA is an
interagency committee that includes representatives of the Office
of the U.S. Trade Representative, the U.S. Department of
Commerce, the U.S. Department of Labor, the U.S. Department of
State, and the U.S. Department of the Treasury.

In May 2003, CITA published in the Federal Register a Notice
of Procedures describing the rules that would govern CITA's
consideration of requests from the public for textile-specific
safeguards on Chinese imports (the "China Textile Safeguard
Regulations").  See Procedures for Considering Requests from the
Public for Textile and Apparel Safeguard Actions on Imports from
China, 68 Fed. Reg. 27787 (May 21, 2003).  As a procedural
matter, CITA explained that it had determined that its Notice of
Procedures was not subject to the Administrative Procedure Act
("APA") requirements to provide prior notice and opportunity for
public comment, pursuant to 5 U.S.C. § 553(a)(1) (foreign affairs
exception) and 5 U.S.C. § 553(b)(A) (exception for interpretative
rules, general statements of policy, or rules of agency
organization, procedure, or practice).  Id. at 27788.  CITA
further stated that it believed that any of its actions under the
textile-specific safeguards were not subject to the APA
rulemaking provisions under the foreign affairs exception.  Id.

Substantively, in describing the scope of the China Textile
Safeguard Regulations, the Notice of Procedures directed that:

> A request [for a textile-specific safeguard] will only
> be considered if the request includes the specific
> information set forth below in support of a claim that
> the Chinese origin textile or apparel product is, <u>due
> to market disruption</u>, threatening to impede the orderly
> development of trade in like or directly competitive
> products.

<u>Id.</u> (emphasis added). Supporting information was specified as:
(A) a product description; (B) import data, which "should
demonstrate that imports of Chinese origin textile and apparel
products . . . are increasing rapidly in absolute terms"; (C)
production data; and (D) market share data. <u>Id.</u> at 27788-89.

Further, the <u>Notice of Procedures</u> specified a three-tier
process for CITA's consideration of requests under the China
Textile Safeguard Regulations. <u>Id.</u> at 27789. First, upon
receipt of a safeguard request from the public, CITA determines
within 15 days whether the request falls within the scope of the
China Textile Safeguard Regulations. <u>Id.</u> Second, if CITA
determines that a request meets the necessary requirements, CITA
publishes a Notice Seeking Public Comments in the <u>Federal
Register</u> and opens a 30-day public comment period. <u>Id.</u> Third,
within 60 days of the close of the public comment period, CITA
determines whether to impose the safeguard. <u>Id.</u> In case of an
affirmative determination, CITA simultaneously imposes the
safeguard (calculated pursuant to the terms of China's Accession

Agreement) and initiates negotiations with China "with a view to easing <u>or avoiding</u> market disruption." <u>Id.</u> (emphasis added).[2]

Beginning in July 2003, domestic textile producers filed four safeguard requests on a variety of textiles, including Chinese gloves that were still under quota. <u>See</u> 68 Fed. Reg. 49440 (Aug. 18, 2003). In August 2003, CITA agreed to consider three requests. <u>See</u> <u>id.</u> at 49441, 49445, 49449. However, CITA rejected consideration of the fourth request concerning Chinese gloves still under quota. In a letter to the National Textile Association, CITA's Chairman indicated that the request was rejected because CITA would not accept requests for safeguards on products still under quota. <u>See</u> Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction ("Pl.'s Br.") at Ex. 4 (Letter from James C. Leonard III to National Textile Association of 8/13/03). However, in June 2004, CITA accepted for consideration a request for safeguards on several merged categories of Chinese socks, including cotton socks that were still under quota. Thereafter, CITA decided to act on the merged request for safeguards because it determined that "imports of socks from China play a

---

[2] CITA issued a clarification of its rules in August 2003 indicating that it would also maintain an official record for each safeguard request made pursuant to the China Textile Safeguard Regulations. <u>See</u> <u>Clarification of Procedures for Considering Requests from the Public for Textile and Apparel Safeguard Actions on Imports from the People's Republic of China</u>, 68 Fed. Reg. 49440 (Aug. 18, 2003).

significant role in the existence of and <u>threat</u> of market disruption." 69 Fed. Reg. 63371, 63372 (Nov. 1, 2004) (emphasis added). CITA imposed quotas on the merged categories of Chinese socks, resulting in a double quota on Chinese cotton socks for the remainder of 2004, and initiated negotiations with the Chinese government. <u>Id.</u>

From July to August 2004, CITA and U.S. Department of Commerce officials made statements to various publications indicating that the China Textile Safeguard Regulations "were intended for cases of actual market disruption rather than the threat of such disruption." BNA Daily Report for Executives, No. 141, *China Textile Safeguards to Focus on Market Disruption Cases, Official Says*, at A-28 (July 23, 2004). Then, in September 2004, CITA announced that "existing US regulations would allow safeguards based on threat of a possible surge in imports, rather than an actual surge." China Trade Extra, *Aldonas Insists China Textile Regs Can Handle Import Threat Cases* (Sept. 3, 2004). None of these statements were made in the <u>Federal Register</u>.

Since October 2004, CITA has accepted for consideration 12 requests for safeguards under the China Textile Safeguard Regulations which allege threat of market disruption (rather than actual market disruption) by Chinese textile imports ("threat-based requests"). <u>See</u> 69 Fed. Reg. 64034 (Nov. 3, 2004); 69 Fed.

Reg. 64911 (Nov. 9, 2004); 69 Fed. Reg. 64912 (Nov. 9, 2004); 69 Fed. Reg. 64913 (Nov. 9, 2004); 69 Fed. Reg. 64914 (Nov. 9, 2004); 69 Fed. Reg. 64915 (Nov. 9, 2004); 69 Fed. Reg. 68133 (Nov. 23, 2004); 69 Fed. Reg. 70661 (Dec. 7, 2004); 69 Fed. Reg. 71781 (Dec. 10, 2004); 69 Fed. Reg. 75516 (Dec. 17, 2004); 69 Fed. Reg. 77232 (Dec. 27, 2004); 69 Fed. Reg. 77998 (Dec. 29, 2004). CITA has not yet acted on any of these requests.

Plaintiff commenced this action by filing a complaint on December 1, 2004. In its complaint, plaintiff alleges that its members made their business plans for 2005 in reliance on CITA's rules and public representations that it would not consider threat-based requests. However, given CITA's recent acceptance of threat-based requests, plaintiff's members have felt compelled to reconfigure their sourcing plans for 2005, since they fear that China will be subject to extremely tight quota restrictions earlier than they had anticipated. As a result, plaintiff asks the Court to enjoin CITA from further accepting, considering, or otherwise proceeding with requests for safeguard measures based on a threat of market disruption.

## Discussion

To prevail on its Motion for a Preliminary Injunction, plaintiff must show: (1) that it will be immediately and irreparably injured; (2) that the balance of hardship on all the parties favors the petitioner; (3) that there is a likelihood of

success on the merits; and (4) that the public interest would be better served by the relief requested. <u>Zenith Radio Corp. v. United States</u>, 710 F.2d 806, 809 (Fed. Cir. 1983).

The Court agrees with plaintiff in both its Motion for a Preliminary Injunction and arguments made at the hearing. Accordingly, the Court finds that plaintiff is entitled to injunctive relief.

## 1.  <u>Immediate and Irreparable Injury</u>

To demonstrate immediate and irreparable injury, "plaintiff must prove that unless the injunction is awarded, some harm will result to it that cannot be reasonably redressed in a court of law." <u>Am. Customs Brokers Co. v. United States Customs Serv.</u>, 10 CIT 385, 386, 637 F. Supp. 218, 220 (1986).

Plaintiff alleges that, unless a preliminary injunction is issued, its members have been and will continue to be irreparably harmed by CITA's consideration of threat-based requests under the China Textile Safeguard Regulations. Pl.'s Br. at 9. Plaintiff contends that CITA's consideration of these requests is unsupported by the text of the China Textile Safeguard Regulations and represents an impermissible departure from CITA's precedent and public statements. <u>Id.</u> at 10. Plaintiff alleges that its members reasonably relied on CITA's rules and precedent with regard to the textile-specific safeguards in designing 2005 business plans. <u>Id.</u> As a result of CITA's insupportable

actions, plaintiff alleges that its members' operations have been and will continue to be disrupted, and its members are being forced to make sub-optimal business decisions that cannot be undone or reimbursed if plaintiff ultimately succeeds on the merits of the case. Id. at 10-11.

The Court finds that several of plaintiff's irreparable harm allegations involve pure economic loss, see, e.g., Declaration of [          ] ("[    ] Decl.") ¶ 6 (describing the company's "substantial economic harm"); Declaration of [          ] ("[   ] Decl.") ¶ 8 (discussing increased shipping costs). As noted by defendant in its Response in Opposition to Declarations Filed by USA-ITA in Support of its Motion for a Preliminary Injunction ("Def.'s Opp'n") at 19, economic loss alone is insufficient to justify preliminary injunctive relief. See, e.g., Wis. Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985). However, the Court also finds that plaintiff has shown much more than just economic loss. Because of CITA's mere acceptance of threat-based requests, plaintiff's members have found it prudent to cancel or consider canceling orders in China and move them to other countries where possible. [    ] Decl. ¶ 7; [    ] Decl. ¶¶ 4, 8; Declaration of [          ] ("[    ] Decl.") ¶ 9. However, it has been difficult for plaintiff's members to find suitable substitute factories because other importers are also scrambling to secure alternative production

facilities.³  See [    ] Decl. ¶ 4.  This difficulty is

exacerbated by the unrefuted fact that Chinese factories

generally have fewer audit failures, ensure more on-time

deliveries, employ highly skilled workers, and operate as some of

the most efficient production facilities in the world.  [      ]

Decl. ¶ 7.  By being forced to move production to less efficient

factories in other countries, id. ¶ 11, plaintiff's members face

the real possibility that they may not be able to deliver

products to their customers in a timely manner, which will impair

their goodwill and business reputation.⁴  See [    ] Decl. ¶ 9; [

   ] Decl. ¶ 7.  This constitutes irreparable injury.  See Zurn

Constructors, Inc. v. B.F. Goodrich Co., 685 F. Supp. 1172, 1181

(D. Kan. 1988) ("Numerous cases support the conclusion that loss

of customers [and] loss of goodwill . . . can constitute

irreparable harm."); Am. Customs Brokers, 10 CIT at 387, 637 F.

Supp. at 221 (finding irreparable injury where plaintiff

---

³ Indeed, as discussed more fully infra, for some products
that can be produced only in China, reallocation of production is
a virtual impossibility.  [    ] Decl. ¶ 9.  This is because some
of plaintiff's members produce [              ] products that
require [
                    ].  Id. ¶¶ 5, 9.

⁴ By moving orders to other countries, plaintiff's members
also risk jeopardizing the longstanding business relationships
they have developed with several of the major garment factories
in China.  [    ] Decl. ¶¶ 6, 8; [        ] Decl. ¶¶ 7, 10.  These
relationships are of the utmost importance to plaintiff's
members, [    ] Decl. ¶ 6, and their impairment constitutes
another form of irreparable injury.

demonstrated substantial harm to business goodwill, business reputation, and a significant loss of new business).

In addition, plaintiff's members' inability to stock shelves in a timely manner will create an unquantifiable ripple effect, as shortages of merchandise in one category can affect sales in other categories.  [     ] Decl. ¶ 5; [     ] Decl. ¶ 4. Moreover, because of the slower production and transit times from countries other than China,[5] plaintiff's members are finding it necessary to place orders earlier than they normally would.  [  ] Decl. ¶ 15.  This, in turn, inhibits the member companies' ability to respond to trend-specific demand, thereby creating an unquantifiable inventory risk.  Id.; [     ] Decl. ¶ 7.  The slow production and transit times also mean that plaintiff's members will be impeded in reordering and timely delivering high-demand items.  [       ] Decl. ¶ 15.  All of this constitutes irreparable injury as well.  See Lois Jeans & Jackets, U.S.A., Inc. v. United States, 5 CIT 238, 241-42, 566 F. Supp. 1523, 1526-27 (1983) (finding irreparable injury where plaintiff demonstrated an inability to fill its customers' orders, injury to its reputation as a reliable supplier, potential unquantifiable costs required for altering its production

---

[5] For example, the transit times from several of the countries to which plaintiff's members have moved their production are typically 25 to 30 days, whereas transit times from China are as few as 11 days.  [       ] Decl. ¶ 14.

methods, and a loss of past and future sales); Am. Air Parcel Forwarding Co. v. United States, 1 CIT 293, 300, 515 F. Supp. 47, 54 (1981) (finding irreparable injury where plaintiff demonstrated significant disruption of its business operations).

Finally, plaintiff provided affidavits indicating that China is the only country from which some of its members are able to obtain certain goods. [       ] Decl. ¶ 17; [     ] Decl. ¶ 9. For instance, one of plaintiff's members is only able to obtain fine gauge knit sweaters from China. [       ] Decl. ¶ 17. However, these sweaters are the subject of threat-based requests that CITA has already accepted for consideration. Id.; Defendant's Memorandum in Support of its Motion to Dismiss and Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Def.'s Br.") at Schedule A. Thus, the member company has been unable to place its full commitment of orders in China for fear that a quota may be filled before it receives the sweaters. [  ] Decl. ¶ 17. This inability of plaintiff's members to obtain certain specialized products from countries other than China constitutes yet another type of irreparable harm. See Green Stripe, Inc. v. Berny's Internacionale, 159 F. Supp. 2d 51, 57 (E.D. Pa. 2001) (finding irreparable harm where defendant's violation of an exclusivity clause in a sales contract prevented plaintiff from being able to sell a unique, perishable product for which there was no available substitute on the market);

Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907-08 (2d Cir. 1990) (finding that termination of the delivery of a unique product results in irreparable harm that is nearly impossible to value).

Defendant argues that plaintiff's assertions of irreparable injury are purely speculative because it is unknown whether CITA will actually impose safeguards. Def.'s Br. at 60; Def.'s Opp'n at 20. The Court disagrees. The irreparable harm suffered by plaintiff arises directly from CITA's mere acceptance of threat-based requests, since such acceptance makes it necessary for plaintiff's members to detrimentally alter their 2005 business plans. Moreover, contrary to defendant's assertion, Def.'s Opp'n at 3, this irreparable harm is ongoing because plaintiff's members typically place about 30 percent of their orders for the second half of 2005 by January 2005. Pl.'s Br. at Ex. 1 (Declaration of Laura E. Jones) ¶ 18; see also [    ] Decl. ¶ 3. Thus, a full 70 percent of plaintiff's members' orders for this period remain in limbo as a result of CITA's actions. Id.

For all these reasons, the Court finds that plaintiff has suffered, and will continue to suffer, irreparable injury if the Court does not enjoin CITA from accepting, considering, or taking any further action on threat-based requests.

2. **Balance of Hardships**

Before granting the requested injunctive relief, the Court must also evaluate the balance of hardships in this case, i.e., "determine which party will suffer the greatest adverse effects as a result of the grant or denial of the preliminary injunction." Ugine-Savoie Imphy v. United States, 24 CIT 1246, 1250, 121 F. Supp. 2d 684, 688 (2000).

The balance of hardships favors granting the requested relief. As discussed above, plaintiff will suffer irreparable injury if an injunction is not issued enjoining CITA's consideration of threat-based requests under the China Textile Safeguard Regulations. In contrast, defendant will not suffer any cognizable harm by issuance of the requested injunction. Contrary to defendant's contention, Def.'s Br. at 67, defendant will still be able to effectively administer the textile-specific safeguards guaranteed by China's Accession Agreement. For example, under the China Textile Safeguard Regulations, CITA may still consider safeguard requests from the public based on actual market disruption caused by Chinese products. 68 Fed. Reg. at 27789. As conceded by defendant, Def.'s Opp'n at 16, CITA may also self-initiate such an inquiry. 68 Fed. Reg. at 27789. Further, since the commencement of this action, CITA has exercised its authority to deny immediate entry into the United States of any products (including Chinese products) shipped in

2004, in excess of 2004 quota limits, for importation in January 2005. See Entry of Shipments of Cotton, Wool, Man-Made Fiber, Silk Blend and Other Vegetable Fiber Textiles and Apparel in Excess of 2004 Agreement Limits or Certain China Safeguard Limits, 69 Fed. Reg. 72181, 72181-82 (Dec. 13, 2004). This measure will certainly enable CITA to limit the volume of Chinese products entering the United States in early 2005. As such, defendant has failed to show that the requested injunctive relief would adversely affect the ability of the United States to implement the terms of China's Accession Agreement or protect the domestic textile industry from a surge of Chinese imports. See Associated Dry Goods Corp. v. United States, 1 CIT 306, 311, 515 F. Supp. 775, 779-80 (1981) (denying preliminary injunction where CITA's ability to conduct foreign policy, implement trade agreements, and protect domestic industry would be impeded).

Where "'little if any harm will befall other interested persons,'" the balance of hardships test favors granting injunctive relief. Id. at 312, 515 F. Supp. at 780 (quoting Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977)). However, as argued by defendant, Def.'s Opp'n at 15, even where the balance of hardships favors the movant, injunctive relief is nonetheless inappropriate where it would effectively grant the relief ultimately requested. Id. at 311, 515 F. Supp. at 780 (citing Selchow & Righter Co. v. W.

Printing & Lithographic Co., 112 F.2d 430, 431 (7th Cir. 1940))
(denying preliminary injunction against imposition of quotas by
CITA in part because interlocutory injunction would achieve
ultimate relief sought).  The rationale for this rule is that
"[a] court should not grant temporary relief in the form of a
preliminary injunction which will dispose of the case on the
merits." Manhattan Shirt Co. v. United States, 2 CIT 270, 274
(1981) (denying preliminary injunction against enforcement of
CITA-embargoed merchandise in part because injunction would
dispose of the case on the merits).  Here, the scope of
plaintiff's complaint clearly exceeds that of the requested
preliminary injunction.  In its complaint, plaintiff has raised
an important question as to whether CITA's delegated authority to
administer textile agreements includes the authority to issue
regulations pursuant to China's Accession Agreement.  Whether a
WTO accession agreement is a "textile agreement" within the
meaning of 7 U.S.C. § 1854 is a question of first impression.  If
plaintiff is fully successful on the merits of the case, CITA's
China Textile Safeguard Regulations will be invalidated in toto.
Such an order would far exceed the more limited scope of the
requested preliminary injunction.  As such, the balance of the
hardships tips in favor of granting preliminary injunctive
relief.

### 3.  Likelihood of Success on the Merits

The Court must also consider whether plaintiff has demonstrated a likelihood of success on the merits of its case before a preliminary injunction may be issued.  Sanho Collections, Ltd. v. Chasen, 1 CIT 6, 12, 505 F. Supp. 204, 208 (1980).  To satisfy this requirement, it is ordinarily sufficient for the party requesting the preliminary injunction to raise "'serious, substantial, difficult and doubtful' questions that are the proper subject of litigation" where it is clear that "the moving party will suffer substantially greater harm by the denial of the preliminary injunction than the non-moving party would by its grant." Ugine-Savoie Imphy, 24 CIT at 1251, 121 F. Supp. 2d at 689 (quoting PPG Indus., Inc. v. United States, 11 CIT 5, 8 (1987)).

In this case, plaintiff has raised sufficiently serious and difficult questions regarding the propriety of CITA's actions to warrant issuance of the preliminary injunction.  Specifically, plaintiff's complaint alleges that CITA's acceptance of threat-based requests violates its own regulations and the APA.  This allegation raises questions as to the applicability of APA rulemaking procedures to CITA's consideration of public requests for safeguards made pursuant to CITA's own published regulations. This important issue was not addressed by the Court's opinion in Mast Industries, Inc. v. Regan, 8 CIT 214, 596 F. Supp. 1567

(1984) (finding APA rulemaking procedures inapplicable to regulations that define or alter quantitative limitations imposed pursuant to a bilateral trade agreement or unilateral action). In addition, plaintiff's complaint alleges that CITA has exceeded its delegated authority by assuming administration of the textile-specific safeguards without a clear Congressional mandate to do so. CITA's ability to administer the terms of a WTO accession agreement is a novel question – both as a matter of first impression and in light of express Congressional action to delegate the administration of other aspects of China's Accession Agreement to the International Trade Commission. See 19 U.S.C. § 2451. Given the seriousness of these questions presented, a preliminary injunction is justified in this case.

### 4. <u>Public Interest</u>

Finally, "[a]ssuming plaintiff has overcome the burden of showing the probability of irreparable harm and the likelihood of success on the merits, or alternatively, that the parties have presented serious questions of law and that the balance of the hardships tips in favor of the plaintiff, the court must still protect the public interest." Associated Dry Goods Corp., 1 CIT at 311, 515 F. Supp. at 779.

In this case, the public interest would be served by granting the requested relief. It is clearly in the public interest that the trade laws be properly administered. <u>PPG</u>

Indus., Inc. v. United States, 14 CIT 18, 22-23, 729 F. Supp. 859, 863 (1990) (finding preliminary injunction against liquidation of entries ordered by the International Trade Administration appropriate to ensure fair interpretation of trade laws). Plaintiff, as the representative of multiple interested parties, has the right to participate in the judicial review process to challenge serious perceived errors in CITA's administration of those laws. See Ceramica Regiomontana, S.A. v. United States, 7 CIT 390, 397, 590 F. Supp. 1260, 1265 (1984) (granting preliminary injunction where plaintiff raised serious concerns about the International Trade Administration's methodology and findings affecting the public interest). Here, plaintiff has raised substantial questions bearing upon the propriety of CITA's actions when considering requests for textile-specific safeguards from the general public. An injunction will "preserve plaintiff's rights until the merits and the issue of compliance with the law are fully considered. It will provide interim relief until those doubts that have been raised are eliminated." PPG Indus., 11 CIT at 10 (finding preliminary injunction against liquidation of entries ordered by the International Trade Administration to be in public interest). Moreover, although there is a "valid public interest in a policy of quantitative import restrictions on textile products[,]" Sanho, 1 CIT at 12, 505 F. Supp. at 208, injunctive relief in

this case will not impede CITA's ability to <u>impose</u> textile-specific safeguards.  Accordingly, the public interest will be served by issuance of the requested injunction.

For the foregoing reasons, the Court grants plaintiff's Motion for a Preliminary Injunction.  A separate order will be issued accordingly.


/s/ Richard W. Goldberg
**Richard W. Goldberg**
**Senior Judge**

**Date:** **December 30, 2004**
**New York, New York**