# United States Court of Appeals for the Federal Circuit

05-1209

U.S. ASSOCIATION OF IMPORTERS OF TEXTILES AND APPAREL,

Plaintiff-Appellee,

v.

UNITED STATES,
DEPARTMENT OF COMMERCE,
CARLOS M. GUTIERREZ, Secretary of Commerce,
DEPARTMENT OF STATE, CONDOLEEZZA RICE, Secretary of State,
DEPARTMENT OF THE TREASURY, JOHN W. SNOW, Secretary of the Treasury,
OFFICE OF THE U.S. TRADE REPRESENTATIVE,
PETER F. ALLGEIER, Acting U.S. Trade Representative,
DEPARTMENT OF LABOR, ELAINE CHAO, Secretary of Labor,
and COMMITTEE FOR THE IMPLEMENTATION OF TEXTILE AGREEMENTS,

Defendants-Appellants.

Brenda A. Jacobs, Sidley Austin Brown & Wood LLP, of Washington, DC, argued for plaintiff-appellee. With her on the brief were Neil R. Ellis, David J. Ludlow, and Sharon H. Yuan.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellants. With her on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; and Michael D. Panzera, Trial Attorney. Of counsel on the brief were Jason Kearns, Attorney, Office of the United States Trade Representative, of Washington, DC; Ada E. Bosque, Attorney, United States Department of Commerce, of Washington, DC; Matthew P. Levin, Attorney, United States Department of Labor, of Washington, DC; Meha A. Shah, Attorney, Office of the Legal Adviser, United States Department of State, of Washington, DC; and John G. Murphy, Jr., Senior Counsel, United States Department of the Treasury, of Washington, DC. Of counsel was Arnold I. Havens, General Counsel.

Appealed from: United States Court of International Trade

Senior Judge Richard W. Goldberg

# United States Court of Appeals for the Federal Circuit

05-1209

U.S. ASSOCIATION OF IMPORTERS OF TEXTILES AND APPAREL,

Plaintiff-Appellee,

v.

UNITED STATES,
DEPARTMENT OF COMMERCE,
CARLOS M. GUTIERREZ, Secretary of Commerce,
DEPARTMENT OF STATE, CONDOLEEZZA RICE, Secretary of State,
DEPARTMENT OF THE TREASURY, JOHN W. SNOW, Secretary of the Treasury,
OFFICE OF THE U.S. TRADE REPRESENTATIVE,
PETER F. ALLGEIER, Acting U.S. Trade Representative,
DEPARTMENT OF LABOR, ELAINE CHAO, Secretary of Labor,
and COMMITTEE FOR THE IMPLEMENTATION OF TEXTILE AGREEMENTS,

Defendants-Appellants.

_____

DECIDED:   June 28, 2005

_____

Before MICHEL, <u>Chief Judge</u>, MAYER and LOURIE, <u>Circuit Judges</u>.

MICHEL, <u>Chief Judge</u>.

The United States and the above-listed federal entities and officials (collectively, the "government") appeal from the December 30, 2004, decision by the United States Court of International Trade ("trial court") granting the motion for a preliminary injunction filed by the U.S. Association of Importers of Textiles and Apparel ("Association").  <u>U.S. Ass'n of Imps. of Textiles & Apparel v. United States</u>, 350 F. Supp. 2d 1342 (Ct. Int'l Trade 2004) ("<u>USA-ITA</u>").  This case was submitted after oral argument on May 5, 2005.

In May 2003, the inter-agency Committee for the Implementation of Textile Agreements ("CITA") published the Procedures for Considering Requests from the Public for Textile and Apparel Safeguard Actions on Imports from China, 68 Fed. Reg. 27,787 ("procedures"). The procedures allow private parties to petition the government to request consultations with China under a "safeguard provision" regarding the importation of textiles in the terms of China's accession to the World Trade Organization ("WTO"). See Protocol on the Accession of the People's Republic of China, § 1.2, WT/L/432 (Nov. 23, 2001) ("Accession Agreement"); Report of the Working Party on the Accession of China, ¶¶ 241-42, WT/ACC/CHN/49 (Oct. 1, 2001) ("Accession Report").

In late 2004, the Association filed suit, alleging, inter alia, that CITA's acceptance for consideration of certain petitions was arbitrary and capricious in that it conflicted with its published procedures. The trial court held that the procedures do not allow CITA to consider petitions based solely on data suggesting a threat of market disruption ("threat-based petitions"); instead, data describing current market disruption is required. Accordingly, the trial court enjoined the government "from accepting, considering, or taking any further action" on threat-based petitions. The trial court further enjoined the government from "self-initiating consideration" whether to take action under the safeguard based on data suggesting merely a threat of market disruption. Because the Association failed to show even a fair chance of success on the merits, we hold that the trial court abused its discretion in granting the preliminary injunction and so we reverse.

I

Pursuant to the Agreement on Textiles and Clothing ("ATC"), previously existing quotas on the importation of textiles and apparel products made in WTO member

countries were to be gradually phased out by January 1, 2005. See Agreement Establishing the World Trade Organization, Apr. 15, 1994, Annex 1A. In 2001, as part of China's accession to the WTO, a specific textile safeguard provision was included in paragraph 242 of the Accession Report to provide temporary relief against market disruption caused or threatened by influxes of Chinese imports of textiles and apparel.

CITA helps administer the paragraph 242 safeguard in the United States under its general authority to "supervise the implementation of all textile trade agreements." Exec. Order 11651, 37 Fed. Reg. 4699 (Mar. 3, 1972)[1]. As noted above, to aid in implementing the safeguard, CITA published procedures describing how petitions from the public for requests under the safeguard would be considered. 68 Fed. Reg. at 27,787-89. The mechanics of the procedures are described in more detail in the trial court's opinion. USA-ITA, 350 F. Supp. 2d at 1344-46.

This case relates to twelve petitions filed after October 2004 that have been accepted for consideration by CITA, which has authority and discretion not to consider defective petitions. See USA-ITA, 350 F. Supp. 2d at 1344-46 (citing the Federal Register notices associated with these petitions). These petitions claimed generally that the January 1, 2005, expiration of the ATC would cause a surge in Chinese imports of textile products, creating market disruption. Because the ATC had not yet expired when the petitions were filed, the petitions were based solely on data suggesting a threat of market disruption and not data describing current market disruption.

---

[1] Executive Order 11651 was amended on other grounds by Executive Order 11951, 42 Fed. Reg. 1453 (Jan. 6, 1977), and Executive Order 12188, 45 Fed. Reg. 989 (Jan. 2, 1980).

05-1209                                  3

The Association filed suit and simultaneously moved for a preliminary injunction preventing CITA from taking any further action on the twelve threat-based petitions. In an order and opinion dated December 30, 2004, the trial court granted the motion for a preliminary injunction and the government appealed. We have jurisdiction under 28 U.S.C. § 1292(c)(1).

## II

Four factors are weighed in considering a motion for a preliminary injunction: (1) immediate and irreparable injury to the movant; (2) the movant's likelihood of success on the merits; (3) the public interest; and (4) the balance of hardship on all the parties. Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed. Cir. 1983). We review the grant of a preliminary injunction by the trial court for abuse of discretion. Id.

## III

Beginning with the likelihood of success prong, the trial court held that it was sufficient for the Association to demonstrate merely "serious, substantial, difficult, and doubtful questions" regarding the merits to meet this prong. USA-ITA, 350 F. Supp. 2d at 1350 (internal quotation omitted). This holding was based, in part, on the trial court's conclusion that the Association had demonstrated that it would "suffer substantially greater harm by the denial of the preliminary injunction than the non-moving party would by its grant." Id. (internal quotation omitted).

The parties dispute whether the trial court's interpretation of the standard for the likelihood of success prong is consistent with our case law. The Association defends the trial court's use of the "serious, substantial, difficult, and doubtful question" standard. In the Ninth Circuit, among others, the likelihood of success and harm-related prongs

are viewed as a "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891, 895 (Fed. Cir. 1998) (applying Ninth Circuit law) (internal quotation omitted). Even if the balance of harms tips sharply in favor of the movant, however, the movant must demonstrate at least a "fair chance of success on the merits" for a preliminary injunction to be appropriate. See Atari Games Corp. v. Nintendo of Am., Inc., 897 F.2d 1572, 1577 (Fed. Cir. 1990) (applying Ninth Circuit law); Mikohn, 165 F.3d at 895 (describing the fair chance minimum as a "pole" of the continuum). The government argues that, in the Federal Circuit, the fair chance standard is applicable only if "a plaintiff's right to judicial review would be rendered 'meaningless.'" The government also argues that the fair chance standard cannot be applied in actions in which an injunction against the government is sought, citing Second Circuit precedent, such as Wright v. Giuliani, 230 F.3d 543 (2d Cir. 2000).

In this case, we need not, and thus do not, resolve the dispute over the legal standard applicable in the Federal Circuit because we hold, as described in detail below, that the Association did not meet even the less demanding fair chance standard for proving the likelihood of success prong. We note, however, that even assuming the fair chance standard to be the correct standard, the trial court's interpretation of this standard was incorrect. On the Association's claim that "CITA's acceptance of threat-based requests violates its own regulations and the APA [Administrative Procedure Act]," the trial court held that "[t]his allegation raises questions as to the applicability of APA rulemaking procedures" that "[were] not addressed by the Court's opinion in Mast Industries, Inc. v. Regan, 8 CIT 214, 596 F. Supp. 1567 (1984)." USA-ITA, 350 F.

Supp. 2d at 1350. On the Association's claim that "CITA has exceeded its delegated authority," the trial court held that this "is a novel question." Id.

The error in the trial court's analysis is in holding that mere novelty is sufficient to demonstrate a fair chance of success. Instead, the movant's evidence and arguments must actually be weighed against those of the non-movant to determine whether the movant's likelihood of success meets the applicable standard, whatever that standard may be.[2] See, e.g., Atari Games, 897 F.2d at 1577-78 (reversing a district court's grant of a preliminary injunction based on the fair chance standard because the district court had failed properly to weigh the evidence presented by the parties); Vehicular Techs. Corp. v. Tital Wheel Int'l, Inc., 141 F.3d 1084 (Fed. Cir. 1998) (considering in detail the evidence and arguments raised by the parties in reversing the district court's grant of a preliminary injunction); Mikohn Gaming, 165 F.3d at 895 (defining "serious questions . . . as questions which cannot be resolved one way or the other at the hearing" (internal quotations omitted)).

Thus, we turn to the arguments and evidence presented by the Association in support of its claims to determine whether the Association has demonstrated a fair chance of success and whether the trial court clearly erred in finding that it had.

## A

The government first contends that the Association is unlikely to succeed because jurisdiction is lacking over each of the four claims in the complaint. Before the

---

[2] Although the trial court addressed the novelty of the Association's authority argument "both as a matter of first impression and in light of express Congressional action to delegate the administration of other aspects of China's Accession Agreement to the International Trade Commission," USA-ITA, 350 F. Supp. 2d at 1350, the allusion to a single argument in a single claim is not a sufficient weighing of the evidence and arguments.

05-1209                                    6

trial court, the government simultaneously opposed the Association's motion for a preliminary injunction and moved to dismiss on jurisdictional grounds. USA-ITA, 350 F. Supp. 2d at 1348. The trial court declined to rule "on defendant's motion to dismiss until briefing on the issues raised therein [was] complete." Id. at 1344 n.1. We see no abuse of discretion in the trial court's decision to delay consideration of the government's motion to dismiss until briefing was completed. We disagree, however, that the jurisdictional arguments could be ignored in ruling on the Association's preliminary injunction motion. The question of jurisdiction closely affects the Association's likelihood of success on its motion for a preliminary injunction. Failing to consider it was legal error.

The government argues that jurisdiction is lacking over each of the Association's claims on ripeness grounds because CITA's decision to consider whether to recommend a request for consultations with China is not a final agency action. It is undisputed that the Association's four claims are based upon the APA. Under a provision of the APA, 5 U.S.C. § 704, a "final agency action" is required before judicial review is appropriate. Other agency actions, such as "[a] preliminary, procedural, or intermediate agency action or ruling," are "subject to review on the review of the final agency action." Id.

Two cases are of primary importance in resolving the parties' dispute as to ripeness: Abbott Laboratories v. Gardner, 387 U.S. 136 (1967), and Federal Trade Commission v. Standard Oil Co., 449 U.S. 232 (1980). Abbott Laboratories involved a regulation requiring prescription drug manufacturers to accompany the brand name of the drug with the government-established name every time the brand name was used

on the packaging. 387 U.S. at 138-39. A group of drug manufacturers brought suit, claiming that this regulation conflicted with the statute the regulation was designed to implement. The Supreme Court recited two factors in determining whether the APA suit was ripe, "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149. Under the first factor, the Court stated that the question in the case was "purely legal," id., and then determined that the action at issue was a final agency action because the regulation was "quite clearly definitive," id. at 151. Under the second factor, the Court concluded that the regulations have "a direct effect on the day-to-day business of all prescription drug companies . . . . Either they must comply with the every time requirement and incur the costs of changing over their promotional material and labeling or they must follow their present course and risk prosecution." Id. at 152 (internal quotation omitted). Accordingly, the Supreme Court concluded that the regulation was a final agency action and, therefore, the case was ripe for review.

In Standard Oil, the Federal Trade Commission ("FTC") issued an administrative complaint against a group of oil companies under authority requiring it to have a "reason to believe" that a violation of the Federal Trade Commission Act ("FTCA") had occurred before a complaint may be issued. 449 U.S. at 234-35. Before the administrative resolution of the FTC's complaint, one of the oil companies filed a complaint in federal district court, alleging that the FTC had issued its complaint without sufficient reason to believe that a violation of the FTCA had occurred.

The Standard Oil Court applied the Abbott Laboratories factors and concluded that the claim was not ripe. Under the first factor, the Supreme Court held that although

the FTC's decision to issue a complaint was "definitive" in the sense that the FTC had firmly decided that it had reason to believe and such a decision was a prerequisite to further agency action, the issuance of a complaint was merely a "threshold determination that further inquiry [was] warranted" and, therefore, not "definitive" as required by Abbott Laboratories. Id. at 241.

Under the second factor, the Standard Oil Court held that the mere issuance of a complaint had "no legal force comparable to that of the regulation at issue in Abbott Laboratories, nor any comparable effect upon [Standard Oil's] daily business." Id. at 242. The Court distinguished the "serious criminal and civil penalties" associated with a failure to comply with the regulation in Abbott Laboratories from the mere "burden of responding to the charges made against" the oil companies resulting from the complaint by the FTC, noting that "[a]lthough this burden [of responding] certainly is substantial, it is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." Id. (internal quotation omitted). The Standard Oil Court also noted that "unlike the review in Abbott Laboratories, judicial review to determine whether the Commission decided that it had the requisite reason to believe would delay resolution of the ultimate question whether the Act was violated." Id. at 242-43.

We find Standard Oil to be the governing precedent in this case. Under the first factor, which addresses the fitness of the issues for judicial review, CITA's decision to consider whether to suggest that consultations be requested in this case is more analogous to the "threshold determination" warranting further investigation in Standard Oil, id. at 241, than to the issuance of a formal regulation after notice and comment

constituting a final agency action in Abbott Laboratories, 387 U.S. at 138-39. The Association counters that this case is fit for judicial review because "this lawsuit is a challenge to CITA's re-interpretation of its regulations to authorize 'threat-based' safeguard requests, not a challenge to a specific safeguard determination," and, therefore, the question in the case is "purely legal." This argument is unpersuasive because pleading a legal question, by itself, is not sufficient to establish fitness for judicial review in this case. In the APA context, the first Abbott Laboratories factor addresses not only the type of challenge being raised but also, and more importantly, the type of decision being challenged. See 387 U.S. at 151 (addressing not only the legal nature of the issue in the case but also the definitive nature of the regulation being challenged). Thus, even assuming that a so-called "purely legal" challenge to an agency action has been pled, the decision being challenged must still be a final agency action. See 5 U.S.C. § 704 (providing that legal challenges to threshold decisions are "subject to review on the review of the final agency action"). In this case, because the decision being challenged is, at most, merely a threshold determination, if anything more than a recommendation, the Association did not meet the first factor, regardless whether it can properly characterize its challenge as "purely legal."

Under the second factor, which addresses the potential for hardship to the parties if a decision is not rendered quickly, the facts of Standard Oil also align more closely with the facts of this case. In Standard Oil, the Supreme Court emphasized that the FTC's filing of a complaint in that case did not have "legal force" comparable to the regulation in Abbott Laboratories and reasoned that the burdens of responding to the complaint were, therefore, "different in kind and legal effect" from the burdens in Abbott

Laboratories.  Standard Oil, 449 U.S. at 242.  In this case, the Association cites a number of actions taken by its members allegedly in response just to CITA's decision to consider the twelve petitions.  These actions were based on the businesses' perceived uncertainty concerning whether, when, and to what extent import relief might be imposed in the future, but not on any legally binding requirement presently imposed by CITA or the government.  In contrast, Abbott Laboratories involved a mandatory regulation with binding legal effect that was issued after formal notice and comment and that was utterly unambiguous.  Thus, following Standard Oil, we hold that any business uncertainty associated with awaiting a final decision from an agency is different in kind and legal effect from the hardship identified in Abbott Laboratories and insufficient to turn a threshold agency decision into a final agency action ripe for review.

Accordingly, the government's arguments as to jurisdiction demonstrate that the Association is not likely to succeed in this litigation, even assuming that the fair chance standard applies.[3]

**B**

**1**

Even were we to disregard the government's jurisdictional arguments, however, we would conclude that the Association has failed to demonstrate even a fair chance of success on any of its four claims in the complaint.  The Association's first claim is that CITA acted arbitrarily and capriciously in allegedly reinterpreting its published procedures to allow consideration of petitions based on data suggesting a threat of

---

[3]    Because we find the government's argument as to ripeness sufficient to demonstrate that the Association does not have even a fair chance of success, we do not reach the government's jurisdictional argument based on exhaustion.

market disruption, rather than data describing current market disruption. It is undisputed that the petitions in question contain data suggesting only a threat of market disruption.

The Association contends that the "plain language and meaning" of the procedures requires data suggesting current market disruption, not merely a threat of market disruption. As noted above, CITA's procedures were adopted to aid in implementing textile and apparel safeguard actions under paragraph 242. 68 Fed. Reg. at 27,787. Paragraph 242 provides, in part:

> In the event that a WTO Member believed that imports of Chinese origin of textiles and apparel products covered by the ATC as of the date the WTO Agreement entered into force, were, due to market disruption, threatening to impede the orderly development of trade in these products, such Member could request consultations with China with a view to easing or avoiding such market disruption. The Member requesting consultations would provide China, at the time of the request, with a detailed factual statement of reasons and justifications for its request for consultations with current data which, in the view of the requesting Member, showed: (1) the existence or threat of market disruption; and (2) the role of products of Chinese origin in that disruption.

Accession Report at ¶ 242(a) (emphasis added).

CITA's procedures closely mirror the language of paragraph 242. Indeed, the first sentence of the body of CITA's procedures is a nearly verbatim quotation from paragraph 242:

> The Accession Agreement textile and apparel safeguard allows the United States and other World Trade Organization Member countries that believe imports of Chinese origin textile and apparel products are, due to market disruption, threatening to impede the orderly development of trade in these products to request consultations with China with a view to easing or avoiding such market disruption.

68 Fed. Reg. at 27,787-88 (emphasis added).

05-1209                                                    12

The primary focus of the Association's argument is on the language from the procedures -- "due to market disruption, threatening to impede the orderly development of trade in these products." The Association contends that this language requires that data describing current market disruption be presented before CITA can lawfully consider whether to request consultations with China.

The Association's argument is unpersuasive because it would require us to read this language out of context. CITA's procedures and paragraph 242 both follow the disputed language with a description of the stated purpose of the paragraph 242 safeguard, which is "easing or avoiding such market disruption." 68 Fed. Reg. at 27,788; Accession Report at ¶ 242(a). The word "avoiding" shows that current market disruption is not a prerequisite for action under either the procedures or paragraph 242 because "such market disruption" cannot be "avoid[ed]" if it has already occurred.

Moreover, the sentence in paragraph 242 containing the disputed language is immediately followed by a requirement that the entity requesting consultations provide China with a "detailed factual statement of reasons and justifications" based on "current data" that shows either "the existence or threat of market disruption." Accession Report at ¶ 242(a) (emphasis added). The language "existence or threat of market disruption" provides context to the disputed language "due to market disruption, threatening to impede the orderly development of trade in these products," demonstrating that current data showing current market disruption is not required.

Indeed, the Association does not dispute that data suggesting merely a threat of market disruption suffices under paragraph 242 but contends only that paragraph 242 is "irrelevant" because "CITA is bound to follow its own regulations." Even assuming

arguendo (although it is doubtful) that the procedures are binding as "regulations" and that CITA, as an intra-agency advisory committee, is an APA "agency" that issues "final agency actions," we disagree that paragraph 242 is irrelevant in interpreting the procedures. The express purpose of the procedures is to implement the paragraph 242 safeguard and the language "due to market disruption, threatening to impede the orderly development of trade" in the procedures is a direct quotation from paragraph 242. Thus, a further reason for rejecting the Association's interpretation of the allegedly "plain language" of the procedures is that it would require us to interpret identical language differently when it is used in paragraph 242 from when it is used in the procedures, despite the fact that the express purpose of the procedures is to aid in implementing paragraph 242.

In addition to focusing on the language "due to market disruption, threatening to impede the orderly development of trade in these products," the Association also quotes from other portions of the procedures, although without much elaboration. These quotations, however, do not demonstrate that data describing current market disruption is required in every case. Instead, the quotations merely identify examples of data that could or, in most cases, should be submitted with a petition. An example is the language emphasized by the Association that "[t]he data should demonstrate that imports . . . are increasing rapidly in absolute terms." 68 Fed. Reg. 27,788 (emphasis added). The use of the term "should," rather than "shall" or "must," confirms that data demonstrating a rapid increase in imports is not required.

Finally, the Association cites several news stories suggesting that some of CITA's personnel have previously made informal statements that seemed to interpret

the procedures as prohibiting the consideration of threat-based petitions.  See, e.g., Industry Warns of New China Textile Threat Cases, Commerce Position Unclear, ChinaTradeExtra.com (Sept. 1, 2004) (quoting an "informed government source" as saying that "it is still an open question whether Commerce can prosecute" threat-based petitions and that an amendment to the procedures would be required to allow consideration of threat-based petitions).[4]  The Association argues that the alleged "interpretations" by these CITA personnel are inconsistent with CITA's current interpretation as reflected in CITA's express decision to accept the threat-based petitions at issue here and the litigation position advanced by the government in this case.

To the extent that the Association is arguing that no deference should be given to CITA's current interpretation of its procedures, the argument is irrelevant because no deference is required where, as here, the procedures themselves are clear.  To the extent that the Association is arguing that the prior statements of interpretation were somehow binding, we disagree.  Although some of these interpretations were offered by high-ranking officials at CITA, these interpretations did not represent the formal position of CITA.  We, therefore, find utterly unpersuasive the Association's reliance on these news stories.

---

[4]    The Association also cites to a letter from James Leonard, Chairman of CITA, dated August 13, 2003, rejecting a petition.  In this letter, Leonard states "Imports of *woven* cotton and man-made fiber gloves from China are subject to specific limits through December 31, 2004.  CITA will not take action under the China textile safeguard on products that are subject to specific limits, as imports of such products from China are already limited."  We disagree with the Association's argument that this letter suggests CITA would not consider threat-based petitions because this letter states only that "CITA will not take action" before January 1, 2005.  The letter, therefore, does not suggest that CITA is barred from considering beforehand whether to take action after January 1, 2005.

Accordingly, we hold that as a matter of law, the Association failed to demonstrate even a fair chance of success on the first claim in the complaint. To the extent the trial court made findings of fact on the likelihood of success prong, these were both infected by legal error and clearly erroneous as a factual matter.

**2**

The second claim in the Association's complaint is that CITA's failure to publish in the Federal Register its "reinterpretation" of the procedures violated 5 U.S.C. § 552(a)(1). Similarly, the third claim is that CITA reinterpreted its procedures without complying with the formal rulemaking requirements of 5 U.S.C. § 553. Each of these claims relies on the premise that CITA's "reinterpretation" is inconsistent with the procedures. Because we hold that the Association has failed to demonstrate a likelihood of success in showing that CITA's current interpretation is inconsistent with the procedures, we also hold that the Association has failed to demonstrate a likelihood of success as to the second and third claims.

**3**

The Association's fourth and final claim in its complaint is that CITA lacks the authority to aid in the administration by the President of the paragraph 242 safeguard. This claim makes no distinction between threatened and current market disruption.

The Association first states that CITA has "assumed authority over the administration of the textile safeguard provision in China's Accession Agreement, even though its mandate only permitted CITA to supervise the implementation of all textile trade agreements." It appears that the Association is arguing that the paragraph 242 safeguard is outside CITA's authority because Executive Order No. 11651 limits CITA

"to supervis[ing] the implementation of all textile trade agreements" and neither the paragraph 242 safeguard nor the China accession agreement qualifies as a "textile trade agreement." The problem with this argument is that the Association does not support its assertion that neither the paragraph 242 safeguard nor the China Accession Agreement qualifies as a textile trade agreement with any reasoning, evidence, or precedent. In any event, the argument utterly fails to persuade if indeed it is not also frivolous.

The Association next claims that the question of CITA's authority as to the paragraph 242 safeguard is "a situation never considered by a court of law." As we held above, however, mere novelty is insufficient to establish a fair chance of prevailing.

We also note that the preliminary injunction was not based on the fourth claim because the preliminary injunction enjoined only threat-based considerations. If the trial court had relied on the fourth claim, it would have enjoined CITA from considering petitions without distinguishing current from threatened market disruption. Indeed, the trial court recognized as much in its analysis of the balance of hardships factor, concluding that granting relief on the Association's fourth claim would require invalidating the procedures altogether, not merely interpreting them not to include consideration of threat-based petitions. USA-ITA, 350 F. Supp. 2d at 1350 ("Whether a WTO accession agreement is a 'textile agreement' . . . is a question of first impression. If plaintiff is fully successful on the merits of the case, CITA's China Textile Safeguard Regulations will be invalidated in toto.").

Accordingly, the Association failed to establish even a "fair chance" of succeeding on its fourth claim and, in any event, the fourth claim does not appear to have been a basis for the preliminary injunction.

**C**

In sum, due to the jurisdictional and merits-based considerations discussed in detail above, the Association has failed to demonstrate even a fair chance of success on the likelihood of success prong as to any of the four claims.

**IV**

Turning briefly to the remaining prongs of the preliminary injunction test, even assuming that each of these prongs weighs in the Association's favor, it was an abuse of discretion for the preliminary injunction to be granted. Regardless whether the fair chance standard or a more demanding standard applies to the likelihood of success prong, the Association did not establish even a fair chance of success on the merits and, therefore, a preliminary injunction was not warranted. See Mikohn Gaming, 165 F.3d at 895 (holding that, regardless of other factors as to harms, a movant's likelihood of success "must carry at least a fair chance of success on the merits in order to warrant interim relief" (internal quotation omitted)).

We note, however, our disagreement with the trial court's wholesale rejection of the harms claimed by the government. The trial court reasoned that the government would "not suffer any cognizable harm by issuance of the requested injunction" because it could still act on data suggesting current market disruption. USA-ITA, 350 F. Supp. 2d at 1349-50. This reason is insufficient to demonstrate that the government would not be harmed by a preliminary injunction because, as noted by the government, the

prohibition from acting on data suggesting a threat of market disruption prevents the government from avoiding market disruption before it occurs and may affect the duration and magnitude of the relief that can be unilaterally imposed by the government. See Accession Report at ¶ 242 (providing that the maximum amount that a WTO member can unilaterally restrict, in general, is 7.5% multiplied by the level of imports in the first twelve of the fourteen months preceding the request and that any import relief imposed under paragraph 242 terminates at the end of the calendar year in which the request for consultation was made unless the request occurred in the final three months of the year).

Accordingly, because the trial court erred in its legal analysis and clearly erred in its fact-finding, it, therefore, abused its discretion in granting the Association's motion for a preliminary injunction and so we reverse.[5]

### REVERSED

---

[5] Because we hold that the trial court's grant of a preliminary injunction was an abuse of discretion, we need not reach the government's contention that the scope of the injunction was overly broad.