**Slip Op. 07-37**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

SEAFOOD EXPORTERS ASSOCIATION
OF INDIA, GOURMET FUSION FOODS
INC., and INTERNATIONAL CREATIVE
FOODS, INC.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,
ROBERT C. BONNER,
COMMISSIONER, UNITED STATES
CUSTOMS AND BORDER
PROTECTION, AND UNITED STATES
CUSTOMS AND BORDER
PROTECTION,

Defendants.

Before:  Timothy C. Stanceu, Judge

Court No. 05-00347

**OPINION AND ORDER**

[Denying defendants' motion to dismiss for lack of subject matter jurisdiction and for failure to
state a claim upon which relief can be granted]

Dated: March 13, 2007

*Kaye Scholer LLP* (*Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Jeffrey S.
Grimson* and *Brady W. Mills*) for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M.
McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States
Department of Justice (*Stephen C. Tosini*); *Chi S. Choy*, Attorney, Office of the Assistant Chief
Counsel for International Trade Litigation, Bureau of Customs and Border Protection, United
States Department of Homeland Security, of counsel, for defendants.

Stanceu, Judge: Plaintiffs Seafood Exporters Association of India ("SEAI"), Gourmet

Fusion Foods Inc. ("GFF"), and International Creative Foods, Inc. ("ICF") (collectively

"plaintiffs") challenge "Bond Directive 99-3510-004," as amended ("Bond Directive"), which was issued by the Bureau of Customs and Border Protection ("Customs" or "CBP"). The Bond Directive, which was issued by Customs headquarters, requires the various Customs port directors throughout the United States to review the sufficiency of the limits of liability in continuous entry bonds ("continuous bonds") used by importers of agricultural and aquacultural merchandise that is subject to antidumping or countervailing duty orders, and to require importers to obtain larger bonds when necessary, according to a prescribed formula. Plaintiffs challenge as unlawful the Bond Directive and the application of the Bond Directive to the determinations by Customs of their individual bonding requirements. First Am. Compl. ¶¶ 3, 14, 19, 28. Plaintiffs contend that Customs lacks the statutory authority to require bonds as security for the payment of antidumping duties that are already secured by cash deposits, that the promulgation of the Bond Directive by Customs violated the Administrative Procedure Act ("APA"), and that the application of the Bond Directive to plaintiffs was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* ¶¶ 3, 24, 26, 28.

Defendants move to dismiss plaintiffs' first amended complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, under USCIT Rules 12(b)(1) and 12(b)(5), respectively. Defs.' Mot. to Dismiss 1-2. With respect to subject matter jurisdiction, defendants argue that plaintiffs' claims do not address a final agency action and therefore are not ripe for judicial review. *Id.* at 9-12. Plaintiffs lack standing, according to defendants, because they fail to demonstrate that they are adversely affected by an agency action and that their interests are within the zone of interests protected under the statutes under which they bring their claim, 19 U.S.C. §§ 1623(a), 1673e(a)(3) (2000). *Id.* at 12-18.

The court concludes that plaintiffs' claims are ripe for review. The actions Customs took to apply the Bond Directive to plaintiffs are fit for judicial decision because of the consequences to plaintiffs' businesses that these actions are alleged to have caused and because of the hardship that would result from withholding court consideration of plaintiffs' claims.

The court concludes that plaintiffs have standing to bring this action. Plaintiffs GFF and ICF allege injury in fact from the increased collateral requirements, higher premium payments, and lost business opportunities that they attribute to the Bond Directive as applied to their businesses. First Am. Compl. ¶ 22; Pls.' Opp'n to Defs.' Mot. to Dismiss 4 ("Pls.' Opp'n"). The interests that these plaintiffs seek to protect are within the zone of interests protected by or regulated by 19 U.S.C. § 1623, under which Customs is authorized to require continuous bonds in amounts necessary to protect the revenue and ensure compliance with the tariff laws. First Am. Compl. ¶¶ 22, 24, 28; Pls.' Opp'n 14-18.

Plaintiff SEAI has met associational standing requirements, which require that at least one member of the association be able to sue in its own right, that the association seek to protect an interest central to its purpose, and that the relief sought not require individualized testimony by member plaintiffs. First Am. Compl. ¶ 1; *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343-44 (1977). SEAI has demonstrated that some of its members would be able to sue in their own right by alleging that these members have incurred specific harm from the application of the Bond Directive to their import activities. First Am. Compl. ¶ 9. SEAI has pleaded that it seeks to protect interests that are central to its purpose as an association, including ensuring the ability of its members to import shrimp and remedying its members' injuries due to the Bond Directive. *Id.* ¶¶ 1, 9. Finally, the relief SEAI

seeks, *i.e.*, that the court declare the Bond Directive contrary to law and enjoin its continued application, does not include damages and would not necessarily require individualized testimony. *Id.* at 14.

There are no grounds to dismiss plaintiffs' complaint for failure to state a claim on which relief can be granted. Defendants offer no argument in support of such dismissal beyond the arguments it makes on standing, which are unavailing. Because plaintiffs' pleadings are sufficient to state a claim upon which relief can be granted and plaintiffs have demonstrated the ripeness of their claims for judicial review and standing to bring those claims, defendants' motion must be denied.

## I. BACKGROUND

GFF and ICF are U.S. importers of seafood from India, including frozen warmwater shrimp. First Am. Compl. ¶ 1. SEAI is an association of some three hundred companies that export seafood from India, including frozen warmwater shrimp, or import Indian seafood into the United States. *Id.* ¶ 1 & Ex. 1 (listing 313 SEAI members as of March 31, 2005). Defendants admit that at least seven SEAI members are importers of shrimp for which Customs deemed bonds insufficient. Defs.' Reply Br. in Supp. of Their Mot. to Dismiss 4 ("Defs.' Reply Br."); *see* First Am. Compl. ¶ 1 & Ex. 1.

Bond Directive 99-3510-004, originally issued by Customs as Directive 3510-04 on July 23, 1991, set forth guidelines under which port directors must assess the sufficiency of an importer's continuous bond. *See Monetary Guidelines for Setting Bond Amounts*, Customs Directive 3510-04 (July 23, 1991), *available at* http://cbp.gov/linkhandler/cgov/toolbox/legal/directives/3510-004.ctt/3510-004.txt. Prior to the

amendment by Customs in 2004, the Bond Directive set a non-discretionary, minimum

continuous bond amount at $50,000 and established a formula by which "the bond limit of

liability amount shall be fixed in multiples of $10,000 [or $100,000] nearest to 10 percent of

duties, taxes and fees paid by the importer or broker acting as importer of record during the

calender year preceding the date of the [bond] application." *Id.* (provided at

"Activity 1 - Importer or Broker - Continuous"). Whether the bond limit was fixed in multiples

of $10,000 or $100,000 depended upon whether or not the importer's total duty and tax liability

during the calender year preceding its bond application exceeded $1,000,000. *Id.*; *see* First Am.

Compl. ¶ 12 n.3.

Customs, on July 9, 2004, posted on its website the amendment to the Bond Directive

that gave rise to this case (the "Amendment"). The Amendment required all Customs port

directors "to review continuous bonds for importers who import agriculture/aquaculture

merchandise subject to antidumping/countervailing duty cases and obtain larger bonds where

necessary." *See Amendment to Bond Directive 99-3510-004 for Certain Merchandise Subject to*

*Antidumping/Countervailing Duty Cases* (July 9, 2004), *available at*

http://www.cbp.gov/xp/cgov/import/cargo_summary/bonds/07082004.xml ("*Amendment*"); *see*

First Am. Compl. ¶ 14. The Amendment established new formulas for calculating minimum

liability limits for these continuous bonds. Under the new formulas, the minimum liability limits

were substantially higher than those required previously.[1] The Amendment directed that "in

fixing the limit of liability amount," port directors will calculate the product of an importer's

---

[1] For further discussion of the Amendment and other subsequent modifications of the
Bond Directive, please see the court's opinion in *Nat'l Fisheries Inst. Inc. v. United States*
*Bureau of Customs and Border Prot.*, 30 CIT __, Slip Op. 06-166 (Nov. 13, 2006).

antidumping or countervailing duty rate and the value of merchandise subject to antidumping or countervailing duties imported by that importer during the previous year. *Amendment* (setting forth the formula as the "[antidumping or countervailing duty] rate at Order [multiplied by the] value of imports of merchandise subject to the case by the importer during the previous year."). Thus, instead of a formula based generally on ten percent of the importer's total duties paid during the previous year, the new formula required a minimum bond set at 100 percent of the antidumping duties that would have been paid on the principal's imports during the previous year, had those imports been subject to the antidumping duty margin required by the order. The formula did not include in its calculation a reduction for cash deposits that would be made, as required under the antidumping laws, as security for future antidumping duty liability on entries made following the publication of an order. *See* 19 U.S.C. § 1673e(a)(3) (directing that an antidumping duty order require the deposit of estimated antidumping duties on entries of subject merchandise).

The Amendment also applied to pre-order entries, *i.e.*, entries subject to provisional antidumping measures in place prior to the publication of an antidumping duty order, by requiring that "[i]f, at any time after [the U.S. Department of Commerce ("Commerce")] issues a preliminary affirmative determination in an agriculture/aquaculture case, [Customs] detects sudden changes in declared values, claimed country of origin, or declared classification, etc., [Customs] will consider such changes to reflect an increased risk." *Amendment*. The Amendment, in that event, required port directors to determine the amount of a continuous bond by calculating the product of the importer's deposit rate in effect on the date of entry and the value of merchandise imported during the previous year. *See id.* (setting forth the formula as the

"[Commerce] deposit rate in effect on date of entry [multiplied by the] value of imports of merchandise subject to the case by the importer during the previous year."). For importers with no prior history of importing agricultural or aquacultural merchandise, the Amendment provided that a sufficient bond amount will be determined by calculating the product of the importer's cash deposit rate in effect on the date of entry and the "estimated annual import value" of the subject imports. *Id.* (setting forth the formula as the "[antidumping or countervailing duty] deposit rate in effect on date of entry [multiplied by the] estimated annual import value of the goods subject to the case.").

As reasons for the substantially higher bond requirements, Customs cited an "increasing concern regarding the collection of antidumping and countervailing duties, the impact of these collections on the amount of disbursements pursuant to the Continued Dumping and Subsidy Offset Act [of 2000, 19 U.S.C. § 1675c (2000) ("Byrd Amendment")] . . . , and continued vigilance by [Customs] to ensure collection of all appropriate antidumping and countervailing duties[.]" *Amendment*; *see* First Am. Compl. ¶ 13. Customs cited specifically the under-collection of antidumping duties on imports of fresh garlic and crawfish from China as a reason for changing the formula. *Amendment*; *see* First Am. Compl. ¶ 13. The Amendment was not subjected to the established notice and comment procedures provided for under the APA and was not published in either the Federal Register or the Customs Bulletin. *See* 5 U.S.C. § 553 (2000).

On January 24, 2005, Customs posted on its website a document entitled "Current Bond Formulas," which contained, *inter alia*, the formulas described in the Amendment. *Current Bond Formulas* (Jan. 24, 2005), *available at* http://www.cbp.gov/xp/cgov/import/communications_to_trade/pilot_program/ ("*Current Bond*

*Formulas*"); *see* First Am. Compl. ¶ 12. The document, which was not published in the Federal Register or the Customs Bulletin, also states that "[a] new comprehensive [Customs] Directive will be issued at a later date." *Current Bond Formulas* at 1.

On February 1, 2005, Commerce issued an antidumping duty order on certain frozen warmwater shrimp from India. *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from India*, 70 Fed. Reg. 5147 (Feb. 1, 2005) ("*Order*"). On the same date, Commerce issued antidumping duty orders on certain shrimp from five other countries.[2] Commerce determined margins ranging from 4.94 to 15.36 percent for three individual Indian producers. *Id.* at 5148. All other producers were subject to the weighted average rate of 10.17 percent. *Id.* Plaintiffs claim that after the publication of the antidumping duty order, Customs issued notices requiring them to post new entry bonds pursuant to the Amendment. First Am. Compl. ¶ 19. Plaintiffs allege that Customs, in applying the new formula, calculated the new minimum limits of liability by multiplying the value of the importer's entries of subject frozen warmwater shrimp in the twelve months proceeding the publication of the antidumping duty order by the applicable margin established in the antidumping duty order, *i.e.,* 10.17 percent for most Indian producers. *Id.*

_____

[2] *See Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from Brazil*, 70 Fed. Reg. 5143 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp From the People's Republic of China*, 70 Fed. Reg. 5149 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from Ecuador*, 70 Fed. Reg. 5156 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from Thailand*, 70 Fed. Reg. 5145 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam*, 70 Fed. Reg. 5152 (Feb. 1, 2005).

On August 10, 2005, after the filing of plaintiffs' first amended complaint on May 23, 2005, Customs posted on its website a clarification to the Bond Directive as modified by the Amendment (the "Clarification"). *Clarification to July 9, 2004 Amended Monetary Guidelines for Setting Bond Amounts for Special Categories of Merchandise Subject to Antidumping and/or Countervailing Duty Cases* (Aug. 10, 2005), *available at* http://www.cbp.gov/xp/cgov/import/cargo_summary/bonds/07082004.xml ("*Clarification*"). According to the Clarification, "Special Categories of merchandise can be designated where additional bond requirements in the form of greater continuous entry bonds or other security, may be required." *Id.* The Clarification designated only agricultural/aquacultural merchandise as a "Special Category." *Id.* The Clarification explained that "[t]he term Covered Cases refers to merchandise within a previously designated Special Category where different standards or formulas for determining the bond amount will be applied." *Id.* Because Customs confined its "Covered Cases" designation to shrimp subject to antidumping or countervailing duty proceedings, importers of certain frozen warmwater shrimp ("subject shrimp") from Brazil, China, Ecuador, India, Thailand and Vietnam, as specified in the scope of the six antidumping duty orders cited above, were made subject to the new bond requirements set forth by Customs in the Amendment and the Clarification. *See id.* The Clarification set forth criteria that Customs is to consider in determining whether imports designated as Special Category or Covered Cases should be subject to increased bond requirements. *Id.*[3] The Clarification also established the

---

[3] The Clarification lists the following criteria:

1. Previous collection problems concerning a specific case or industry involved;
2. The similarity to previous cases or industries experiencing uncollected revenue problems; 3. Whether the merchandise in question had very low duty rates or was

procedure for notice, timing, and appeal of increased bond demands made by Customs for importers of Special Category and Covered Cases merchandise. *Id.* The Clarification was not the subject of a notice and comment proceeding and was not published in the Federal Register or the Customs Bulletin.

On October 24, 2006, Customs published a Federal Register notice (the "Notice") "to provide additional information on the process used to determine bond amounts for importations involving elevated collection risks and to seek public comment on that process." *Monetary Guidelines for Setting Bond Amounts for Imp. Subject to Enhanced Bonding Requirements*, 71 Fed. Reg. 62,276, 62,276 (Oct. 24, 2006) ("*Notice*"). The Notice announced changes to the process discussed in the Amendment and the Clarification and, although inviting public comment, made the changes in the process effective upon publication. *Id.* (stating that "[t]he process published in this Notice is in effect."). The Notice retained the same basic formulas as those set forth in the Amendment and the Clarification for calculating limits of liability for the continuous bonds required of importers of merchandise in Special Categories. *Id.* at 62,277. The Notice announced, however, that Customs will provide for public notice and comment on the designation of new Special Categories, which will occur according to specified criteria, and that Customs also will provide for public notice of the removal of a designation. *Id.*

---

duty-free prior to initiation of an antidumping or countervailing duty case; 4. The projected ability of the industry to pay future duty liabilities; 5. Low capitalization of the industry involved such that new or increased duty liabilities create increased risk; 6. Whether the industry involved is highly leveraged such that new or increased duty liabilities create increased risk; 7. Any other factors that are deemed relevant.

*Clarification*.

The Notice did not announce that Customs was changing the current designation of aquacultural merchandise as a Special Category or the current designation of the shrimp antidumping duty orders as Covered Cases, but it indicated that Customs no longer will designate Covered Cases. *Id.* "[Customs] will continue to evaluate on an industry wide basis those types of merchandise where additional bond requirements may be needed. However, because importers are only affected when merchandise is subject to different bond requirements, [Customs] will only designate Special Categories, that is, merchandise for which an enhanced bond amount may be required." *Id*. The Notice stated, further, that importers of Special Category merchandise "will be offered the opportunity to submit information on their financial condition related to the risk of non-collection for that importer and [Customs] will determine bond amounts based on that information, the importer's compliance history and other relevant information available to [Customs]." *Id*. The Notice indicated, however, that absent a submission by the importer, Customs would determine the bond amount according to the formulas provided in the Notice. *Id.*

The Notice announced a new procedure that Customs would apply when considering whether to impose a new bond requirement on an importer of Special Category merchandise. *Id.* at 62,278. The new procedure would allow the principal thirty days to respond and to provide evidence supporting a lower bond amount, including financial information relevant to the importer's ability to pay, such as financial statements and tax returns. *Id.* The Notice stated that Customs would consider this information along with the factors identified in the applicable Customs regulation, 19 C.F.R. § 113.13(b), in determining a new bond requirement. *Id.* This new bond requirement "w[ould] not take effect with respect to a principal until 14 days after the

date of [Customs'] reply to the principal's response." *Id.* The Notice indicated that Customs

intends to exercise discretion in setting new bond amounts. "If [Customs] determines that the

principal has a record of compliance with customs laws and regulations and that the principal has

demonstrated an ability to pay, [Customs] may decide not to require an increased bond amount

even though the principal imports Special Category merchandise." *Id.* The Notice, however,

also stated that "[a]t any time after [Customs] determines a bond amount for a principal below

that provided by the formula, if the principal fails to remain compliant with customs laws and

regulations, [Customs] will recalculate the principal's bond amount in accordance with the

formulas outlined in this notice." *Id.*

Plaintiffs challenge the Bond Directive on several grounds. First, plaintiffs maintain that

the Bond Directive exceeds Customs' statutory authority by requiring security for the payment of

antidumping duties in excess of that provided under 19 U.S.C. § 1673e(a)(3). First Am. Compl.

¶ 24. Plaintiffs further allege that the Bond Directive constitutes a substantive rule that was

promulgated in violation of notice and comment requirements under the APA, 5 U.S.C. § 553

(setting forth notice and comment procedures for agency rulemaking actions) and under

19 U.S.C. § 1625(c) (setting forth procedures for modification or revocation of interpretive

rulings and decisions of Customs). *Id.* ¶ 26. Finally, plaintiffs allege that the Bond Directive and

its application to plaintiffs is arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law and that it therefore constitutes an unlawful agency action pursuant to the

APA, 5 U.S.C. § 706(2) (2000). *Id.* ¶ 28.

As discussed previously, defendants move to dismiss plaintiffs' first amended complaint

pursuant to USCIT Rule 12(b)(1) for lack of subject matter jurisdiction and pursuant to Rule

12(b)(5) for failure to state a claim upon which relief can be granted. Defs.' Mot. to Dismiss 1-2. Defendants argue that plaintiffs' claims are not ripe for judicial review because the Bond Directive is not a final agency action. *Id.* at 9-12. Defendants also argue that plaintiffs lack standing because they fail to demonstrate that they are adversely affected by an agency action and fail to demonstrate that the interests they seek to protect are within the zone of interests protected by the relevant statutes, 19 U.S.C. §§ 1623(a) and 1673e(a)(3). *Id.* at 12-18. For the reasons discussed in this opinion, the court denies defendants' motion.

## II. DISCUSSION

Plaintiffs invoke the court's jurisdiction under 28 U.S.C. § 1581(i) (2000). First Am. Compl. ¶¶ 4-7. Defendants do not contest that § 1581(i) generally describes the subject matter of plaintiffs' action but instead base their challenge to subject matter jurisdiction on an alleged lack of ripeness and an alleged lack of standing by plaintiffs to bring the case. Defs.' Mot. to Dismiss 6, 12.

The court reviews agency action under 28 U.S.C. § 1581(i) only when review is not available under one of the other subsections of 28 U.S.C. § 1581 or when the remedy afforded by another subsection would be "manifestly inadequate."[4] *Miller & Co. v. United States*, 824 F.2d

---

[4] In pertinent part, 28 U.S.C. § 1581(i) provides:

> In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of [§ 1581,] . . . the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for–
> (1) revenue from imports or tonnage;
> (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
> . . . or

961, 963 (Fed. Cir. 1987).  Plaintiffs' challenge to the administrative actions by Customs does not fall within the specific matters described in subsections (a) through (h) of § 1581.  *See generally* 28 U.S.C. § 1581(a)-(h).

The court concludes that the subject matter of this case falls within the jurisdiction granted by § 1581(i)(4) as it relates to § 1581(i)(1) and (i)(2).  In § 1581(i)(4), the court is provided exclusive jurisdiction over any civil action commenced against the United States that arises out of any law of the United States providing for "administration and enforcement with respect to the matters referred to" in § 1581(i)(1)-(3).  28 U.S.C. § 1581(i)(4).  Subsection (i)(1) of § 1581 refers to laws of the United States providing for "revenue from imports or tonnage"; subsection (i)(2) refers to laws of the United States providing for duties "on the importation of merchandise for reasons other than the raising of revenue."  *Id.* § 1581(i)(1)-(2).  This case arises under 19 U.S.C. § 1623, which, in authorizing Customs to require importers to obtain various bonds, is a law of the United States providing for administration of the tariff provisions under which revenue is collected from imports and also providing for administration and enforcement of the tariff laws generally.

A.  Defendants' Motion to Dismiss Pursuant to USCIT Rule 12(b)(1) for Lack of Ripeness

According to defendants, the agency action being challenged in this case must constitute "final" agency action within the meaning of the APA, 5 U.S.C. § 704 (2000), in order for plaintiffs' case to be ripe for judicial review.  Defs.' Mot. to Dismiss 9-11.  The APA subjects to judicial review "[a]gency action made reviewable by statute and *final* agency action for which

_____

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of [§ 1581(i)] and subsections (a)-(h) of [§ 1581].

there is no other adequate remedy in a court[.]"  5 U.S.C. § 704 (emphasis added).  Defendants

maintain that the Bond Directive, as amended on July 9, 2004, "is not final agency action," that

"[i]t merely provides guidelines to port directors to assist them in fixing the limit of liability for

continuous entry bonds," and that "[u]nder regulation, the sufficiency of bonds is determined

separately."  Defs.' Mot. to Dismiss 9 (citing 19 C.F.R. § 113.11).  Defendants argue that the

Amendment itself inflicts no injury and in this respect is not materially different from Bond

Directive 99-3510-004 as it existed prior to the Amendment, which was involved in *Carolina*

*Tobacco Co. v. Bureau of Customs and Border Protection*, 402 F.3d 1345 (Fed. Cir. 2005).  *Id.*

at 10.  Defendants state that the "July 2004 memorandum neither marks the consummation of the

agency's decision-making process nor constitutes an action by which rights or obligations have

been determined or from which legal consequences will flow[,]" adding that "plaintiffs fail to

establish undue hardship that would justify interfering with a continuing administrative process."

*Id*. at 4.

Because it relies for subject matter jurisdiction on 28 U.S.C. § 1581(i), plaintiffs' cause of

action can be described as arising under the APA.  *See Shinyei Corp. of Am. v. United States*, 355

F.3d 1297, 1304-06 (Fed. Cir. 2004).  Accordingly, the court agrees with the first point in

defendants' ripeness argument, *i.e.*, that plaintiffs' suit is not ripe for judicial review unless the

action being challenged is "final" within the meaning of 5 U.S.C. § 704.  Nor does the court take

issue with defendants' characterization of the Bond Directive as a "continuing administrative

process."  *See* Defs.' Mot. to Dismiss 4, 6-12.  The procedures and policies underlying the

various issuances comprising the Bond Directive, under which Customs has addressed the

question of bonding requirements for shrimp imports subject to the antidumping duty orders,

appear to have changed over time. These policies appear to have changed after issuance of the Amendment on July 9, 2004, and in particular upon publication of the Notice in October 2006, which occurred after plaintiffs brought this action.

The court is unable to agree with the remainder of defendants' ripeness argument, which construes plaintiffs' complaint solely as a judicial challenge to the amended Bond Directive. Defendants argue that "[a]lthough plaintiffs' response to our motion to dismiss clarifies that plaintiffs, in fact, seek to challenge final bond determinations, the first amended complaint does not reflect plaintiffs' current position and, therefore, fails to establish the Court's jurisdiction to entertain this matter." Defs.' Reply Br. 2. Defendants argue that the court must construe only the allegations in the complaint, not those in the plaintiffs' response to the motion to dismiss. *Id.* For this argument, defendants rely on *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972). *See id.*

Defendants' ripeness argument is based on an overly narrow interpretation of the claims in plaintiffs' complaint. Defendants' argument overlooks that plaintiffs' action, even when construed according to the complaint itself and not as supplemented by plaintiffs' subsequent submissions, is not confined to the Bond Directive *per se*. Count three of the complaint expressly challenges not only the Bond Directive but also the *application* of the Bond Directive to plaintiffs. First Am. Compl. ¶ 28 ("The Bond Directive, *and CBP's application of the Bond Directive to Plaintiffs*, is [*sic*] arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law . . . ." (emphasis added)). Plaintiffs allege elsewhere in the complaint that they began receiving bond insufficiency notices from Customs shortly after the publication of the antidumping duty order on shrimp from India. *Id.* ¶ 19. They allege that they consistently were

advised by Customs that the Bond Directive was being administered pursuant to a nationwide "Pilot Bond Centralization Program" such that Customs, in applying the Bond Directive to plaintiffs, would exercise no discretion to adjust the minimum bond amounts resulting from the formula in the Bond Directive. *Id.* ¶ 21. They further allege that the inflexible application by Customs of the Bond Directive to plaintiffs forced plaintiffs to secure bonds with substantially increased limits of liability, which in many cases required plaintiffs to provide 100 percent collateral, or else discontinue their importations of shrimp subject to the antidumping duty order. *Id.* ¶ 22. They specifically allege that plaintiff GFF was informed by Customs that in order to continue importing merchandise it would be required to replace its existing bond, which had a limit of liability of $50,000, with a new bond with a liability limit of $2.8 million. *Id.* ¶ 20. Based on these allegations, they seek declaratory relief that the amended Bond Directive, by itself and as applied, is contrary to law, as well as permanent injunctive relief. *See id.* at 14.

Defendants' reliance on *California Motor Transport Co.* is misplaced. The Supreme Court held in *California Motor Transport Co.* that a complaint alleging a conspiracy by certain motor carriers to monopolize the transport of goods in violation of the Clayton Act, despite the right to petition guaranteed by the First Amendment, was not properly dismissed for failure to state a cause of action, where that complaint alleged a conspiracy of the motor carriers to weaken or eliminate competition by initiating state and federal proceedings allegedly intended to defeat attempts of competitors and potential competitors to acquire operating rights. 404 U.S. at 509, 515. Defendants direct our attention to the Supreme Court's statement in the opinion that, for purposes of the motion to dismiss, "[w]e must, of course, take the allegations of the complaint at face value[.]" *Id.* at 515-16 (citing *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382

U.S. 172, 174-75 (1965)); *see* Defs.' Reply Br. 2. When considered in the context of the Supreme Court's opinion, this sentence is not a limitation on a court's ability to consider, at the pleading stage, submissions other than the complaint; it is instead a restatement of the established principle that for purposes of ruling on a motion to dismiss for failure to state a claim on which relief can be granted, the court assumes that a plaintiff's factual allegations are true. In this case, the court must take the allegations in plaintiffs' complaint at face value, and does so, in ruling on the motion to dismiss.

In determining ripeness for judicial review, a court is to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *see also Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1581 (Fed. Cir. 1993). The complaint, by alleging various direct and significant consequences stemming from the application to plaintiffs of the Bond Directive, and by basing its demand for relief on those allegations, satisfies both factors. Plaintiffs allege in substance that they already have experienced concrete and harmful effects from the Bond Directive as applied to them. First Am. Compl. ¶¶ 20, 22. They allege that these effects are continuing and will continue absent the judicial remedy they seek, which is a declaratory judgment that the Bond Directive is contrary to law and a permanent injunction against its continued application. *Id.* at 14.

The facts pleaded by plaintiffs are distinguishable from those of various cases upon which defendants rely for their argument that this case is not ripe for judicial review. Several of these cases involve refusal by the Court of International Trade to review claims that were considered premature because the result of the administrative proceedings was unknown at the time of filing.

Defs.' Mot. to Dismiss 7-8 (citing *Intercargo Ins. Co. v. United States*, 19 CIT 1435, 912 F.

Supp. 544 (1995); *Sharp Elecs. Corp. v. United States*, 13 CIT 732, 720 F. Supp. 1014 (1989);

and *Matsushita Elec. Indus. Co. v. United States*, 12 CIT 455, 688 F. Supp 617 (1988)).

Defendants characterize these cases as supporting dismissal in this case. *Id.* In defendants' view,

the case is premature because administrative proceedings are continuing and have not resulted in

a final decision. *Id.* The court is unable to agree with this conclusion.

Plaintiffs' case is not premature. Plaintiffs demand relief based on allegations of

consequences, past and present, of bond insufficiency determinations and related actions by

Customs that already have occurred. That the policies and procedures addressed in the Bond

Directive have evolved over time and still may be evolving is not a basis to preclude judicial

review in this case, where Customs is alleged to have issued insufficiency notices to plaintiffs

pursuant to those policies and procedures. Were the court to accept defendants' argument, the

plaintiffs in this case and other potential, similarly situated plaintiffs would have to await a more

definitive statement by Customs of those policies and procedures before bringing a suit,

regardless of the past and current effects of the application of the Bond Directive as it has existed

and exists today. Defendants' ripeness argument, if accepted by the court, would preclude, for an

indefinite time, any judicial review of the actions taken by Customs to apply the Bond Directive

to specific importers, despite the harm that those actions are alleged to have caused, or to

continue to cause, to affected importers and their business activities. Defendants nevertheless

contend that "[n]o undue hardship has been imposed upon plaintiffs, and they should await final

agency action before seeking judicial review." *Id.* at 12. This statement of defendants is

conjectural and meritless. Regardless of the evolving Customs policies, demands by Customs for

bonds with high limits of liability may well impose significant hardships on importers.  *See Nat'l Fisheries Inst. Inc.*, 30 CIT at __, __, Slip Op. 06-166 at 18-21, 31-39.

The holding in *Carolina Tobacco Co.*, to which defendants also cite, does not require dismissal of the complaint in this case.  *See Carolina Tobacco Co. v. United States Customs Serv.*, 28 CIT __, Slip Op. 04-20 (2004), *aff'd, Carolina Tobacco Co. v. Bureau of Customs and Border Prot.*, 402 F.3d 1345 (Fed. Cir. 2005).  The plaintiff in *Carolina Tobacco Co.* had sued in the Court of International Trade to enjoin Customs from requiring it to replace its existing continuous bond of $80,000 with a continuous bond having a limit of liability of $3 million without first considering the six factors specified in the guidelines set forth at 19 C.F.R. § 113.13(b) and from demanding a new continuous bond in an amount exceeding that necessary to ensure compliance with customs laws and regulations.[5]  *Id.*  The Court of International Trade, in granting the government's motion for judgment on the agency record, upheld the decision by Customs to require replacement of Carolina Tobacco Co.'s $80,000 continuous bond with a $3 million continuous bond.  *See id.* at 3, 6-7.  Customs had made that determination based on

---

[5] Under 19 C.F.R. § 113.13(b), the port director

should at least consider: (1) The prior record of the principal in timely payment of duties, taxes, and charges with respect to the transaction(s) involving such payments; (2) The prior record of the principal in complying with Customs demands for redelivery, the obligation to hold unexamined merchandise intact, and other requirements relating to enforcement and administration of Customs and other laws and regulations; (3) The value and nature of the merchandise involved in the transaction(s) to be secured; (4) The degree and type of supervision that Customs will exercise over the transaction(s); (5) The prior record of the principal in honoring bond commitments, including the payment of liquidated damages; and (6) Any additional information contained in any application for a bond.

19 C.F.R. § 113.13(b).

record evidence demonstrating that Carolina Tobacco Co.'s imports of tobacco products had increased to $13.8 million in 2001-2002 from $8.2 million in 2000-2001 and that for the year prior to the new bond determination, the duties, taxes, and fees paid to Customs by Carolina Tobacco Co. had been approximately $26 million. *Id.* at 3-4. Application of the ten percent formula in Bond Directive 99-3510-004, when rounded, resulted in a $3 million bond requirement. *Id.*

The Court of International Trade concluded in *Carolina Tobacco Co.* that "the regulatory framework Customs has established," which consisted of 19 C.F.R. § 113.13 and Bond Directive 99-3510-004, and specifically the requirement in Bond Directive 99-3510-004 for a minimum bond of ten percent of the previous year's duties, taxes, and fees, "[wa]s not unreasonable given the discretion ceded to it by Congress in 19 U.S.C. § 1623(a)." *Id.* at 7. Carolina Tobacco Co. had argued in the Court of International Trade that 19 C.F.R. § 113.13 required Customs to give Carolina Tobacco Co. an "individualized assessment" based on the six factors specified therein rather than simply resort to the ten percent minimum requirement in Bond Directive 99-3510-004. *Id.* at 5-6. The Court of International Trade, rejecting this argument, stated that "[t]he Court is satisfied with Customs' explanation that, due to the lag time before it could stop an importer from withdrawing merchandise for consumption, a 10 percent bond is a necessary minimum amount of protection for the revenue." *Id.* at 6. The Court of Appeals, rejecting the same argument of Carolina Tobacco Co., affirmed the judgment of the Court of International Trade, further observing that "[e]ven if the Section 113.13(b) regulation required some individualized consideration by Customs of the six factors before setting the amount of the bond, Carolina has not shown that Customs failed to give such consideration in this case." *Carolina*

*Tobacco Co.*, 402 F.3d at 1350. The Court of Appeals in *Carolina Tobacco Co.* affirmed the conclusions of the Court of International Trade that the particular bond determination at issue was supported by record evidence and was made according to a regulatory framework that was reasonable. *Id.* Nothing in the opinion of the Court of Appeals in *Carolina Tobacco Co.* convinces the court that a party may not bring a challenge to the Bond Directive as it was specifically modified and applied to bond determinations in the circumstances of this case.

Defendants also rely on *U.S. Ass'n of Importers of Textiles & Apparel v. United States*, 413 F.3d 1344 (Fed. Cir. 2005) ("*USA-ITA*"), arguing that mere threshold determinations are not ripe for review, that plaintiffs merely face business uncertainty, and that business uncertainty is insufficient to convert a threshold determination into a final agency action. *See* Defs.' Mot. to Dismiss 11-12. *USA-ITA*, however, involved a judicial challenge to an agency action in a procedural posture that is not analogous to this case. In *USA-ITA*, the Court of Appeals for the Federal Circuit concluded that the acceptance by the Committee for the Implementation of Textile Agreements ("CITA") of twelve petitions filed by the domestic textile industry to begin a process of consultations with China on textile imports was not a final agency action that was ripe for judicial review. *USA-ITA*, 413 F.3d at 1346, 1349-50. The mere acceptance of the petitions, without further action by CITA, did not result in any limitations on textile or apparel imports by the plaintiff and did not signify that any such limitations would occur. *See id.* In contrast, Customs placed the amended Bond Directive into effect by issuing insufficiency notices. Plaintiffs in this case, by alleging that they already have experienced concrete effects on their businesses resulting from the application of the Bond Directive, have alleged actual consequences extending well beyond business uncertainty. *See* First Am. Compl. ¶¶ 19-22.

B.  Defendants' Motion to Dismiss under USCIT Rule 12(b)(5) for Lack of Standing

In addition to moving to dismiss for lack of subject matter jurisdiction, defendants move to dismiss under USCIT Rule 12(b)(5) for failure to state a claim upon which relief can be granted.  In moving to dismiss under Rule 12(b)(5), defendants rely solely on their arguments pertaining to standing.  Defs.' Mot. to Dismiss 4-5, 12-18.  For the reasons discussed below, the court concludes that all three plaintiffs have standing to maintain this action.

Dismissal for failure to state a claim upon which relief can be granted is proper only when a plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Leider v. United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002).  In deciding a Rule 12(b)(5) motion, the court assumes that all well-pleaded factual allegations in the complaint are true and draws all reasonable inferences in the plaintiff's favor. *Leider*, 301 F.3d at 1295; *United States v. Islip*, 22 CIT 852, 854, 18 F. Supp. 2d 1047, 1051 (1998) (quoting *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).  Plaintiffs are not required to set out in detail the facts upon which the claim is based but rather must merely allege facts sufficient to give "fair notice of what the plaintiff[s'] claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47.

Plaintiffs have standing to bring an action under 28 U.S.C. § 1581(i) if they are "adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." 28 U.S.C. § 2631(i) (2000).  Section 702 of Title 5 sets forth the APA standing requirement, providing that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702 (2000).  To have standing to challenge an agency action under

the APA, a plaintiff must allege an "injury in fact," a requirement grounded in Article III of the United States Constitution, which limits the exercise of the judicial power to "cases" and "controversies." *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151-52 (1970). Further, to have standing under the APA, a plaintiff must assert an interest that is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153.

Defendants argue that plaintiffs lack standing because they "are not persons adversely affected or aggrieved by agency action within the meaning of 19 U.S.C. §§ 1623(a) [or] 1673e(a)(3)[.]" Defs.' Mot. to Dismiss 12. According to defendants, plaintiffs fail to allege an injury in fact and merely make vague and generalized allegations of injury or alleged specific injuries that are not cognizable, such as a barrier to export. *Id.* at 13, 15. Defendants also contest plaintiffs' standing on the ground that plaintiffs failed to assert an interest within the zone of interests protected by applicable statutes. *See id.* at 16-18. Defendants assert that the applicable statutes do not protect the right to export, which defendants submit to be plaintiffs' stated interest. *Id.* at 16, 18.

### 1. Plaintiffs GFF and ICF Have Established Standing to Sue

The complaint alleges that plaintiffs GFF and ICF are U.S. importers of subject frozen warmwater shrimp from India and that they are "'adversely affected or aggrieved' by the unauthorized and unlawful actions of CBP in requiring increased continuous entry bonds pursuant to the Bond Directive." First Am. Compl. ¶ 9 (quoting 5 U.S.C. § 702 and 28 U.S.C. § 2631(i)). As noted previously, the complaint alleges specifically that GFF was informed by Customs that it would need to replace its $50,000 bond with a $2.8 million bond in order to continue importing.

*Id.* ¶ 20.  The complaint is not similarly specific with respect to ICF but contains allegations that plaintiffs suffered and continue to suffer economic injuries in the form of higher bond premiums, increased collateral requirements as high as 100 percent, and the loss of business, either because of the inability to meet the higher bond premiums and collateral requirements or because of the need to reduce their subject shrimp imports to stay within their current bond liability limits.  *See id.* ¶¶ 19-22.  Because the complaint alleges injury in fact occurring to GFF and ICF in their activities as importers, the court is unable to agree with defendants' characterization of the complaint as making only vague and generalized allegations of injury that are insufficient for purposes of standing.

In determining whether a plaintiff's interests fall within the zone of interests of a relevant statute, the court looks to "discern the interests 'arguably . . . to be protected' by the statutory provision at issue; [and] then inquire[s] whether the plaintiff's interests affected by the agency action in question are among [those protected interests]."  *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998) (quoting *Ass'n of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 153).  As discussed previously in this opinion with respect to subject matter jurisdiction, plaintiffs' case arises under 19 U.S.C. § 1623, in which Congress provided Customs the authority to require various bonds and the authority to set the form, conditions, and amount of penalty of a bond.[6]  *See* 19 U.S.C. § 1623(a), (b)(1).  Subsection (a) of the statute, in authorizing

---

[6] Plaintiffs also argue that their cause of action arises under, and that they have interests within the zone of interests protected by, 19 U.S.C. § 1673e(a)(3), which provides for cash deposits of estimated antidumping duty liability pending liquidation of the entries.  First Am. Compl. ¶ 24.  The parties addressed this issue in their briefs.  Defs.' Mot. to Dismiss 16-18; Pls.' Opp'n 14-18.  The provision at § 1673e(a)(3) regulates Commerce, not Customs, and in this respect is not as directly involved in plaintiffs' claims as is § 1623.  *See* 19 U.S.C. § 1623.  Because of the court's conclusions concerning ripeness and standing with respect to claims

the requirement of a bond or other security when a bond is not specifically required by law, conditions that authority by providing that Customs officers may require such bonds as are "necessary for the protection of the revenue or to assure compliance with any provision of law, regulation, or instruction" which Customs is authorized to enforce. *Id.* § 1623(a).[7] Congress expressly authorized, in subsections (b)(3) and (b)(4), execution of continuous ("term") and consolidated bonds, respectively, which provide certain conveniences to frequent importers not provided by single entry bonds. *See id.* § 1623(b)(3)-(4). Undeniably, an importer obtaining a term bond to satisfy its bonding obligations has an interest in obtaining a term bond with a limit of liability that is not greater than necessary to protect the revenue and to ensure compliance with tariff laws. The discretion of Customs in establishing the requirements for term bonds under 19 U.S.C. § 1623 is not unlimited. *See Nat'l Fisheries Inst. Inc.*, 30 CIT at __, __, Slip Op. 06-166 at 51 (concluding that the discretion of Customs to set the liability amount of a term bond is not unlimited and potentially is reviewable under the "arbitrary and capricious" standard of review). The court concludes, therefore, that GFF and ICF have asserted interests falling within the zone of

---

arising under § 1623, as presented in this opinion, the court does not reach the issues the parties have raised concerning § 1673e(a)(3).

[7] Subsection (a) of 19 U.S.C. § 1623 provides that

[i]n any case in which bond or other security is not specifically required by law, the Secretary of the Treasury may by regulation or specific instruction require, or authorize customs officers to require, such bonds or other security as he, or they, may deem necessary for the protection of the revenue or to assure compliance with any provision of law, regulation, or instruction which the Secretary of the Treasury or the Customs Service may be authorized to enforce.

19 U.S.C. § 1623(a).

interests protected by 19 U.S.C. § 1623. SEAI has asserted interests of its members who are importers that also fall within this zone of interests. The court next addresses particular standing issues arising from SEAI's status as an association.

## 2. SEAI Has Representational Standing

The court concludes that SEAI has standing to participate as a plaintiff in this action. As discussed above, a party may bring a case under 28 U.S.C. § 1581(i) if it is adversely affected or aggrieved by agency action within the meaning of the APA standing provision. *See* 28 U.S.C. § 2631(i). The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The term "person," as used in this provision, includes an association. 5 U.S.C. §§ 551(2), 701(b)(2) (2000).

Plaintiff SEAI alleges no injury occurring to itself in its activities as an association. Instead, the cause of action pleaded on behalf of SEAI depends on "representational" standing, *i.e.*, standing that relies solely on the status of SEAI as a representative of its members. *See* First Am. Compl. ¶ 1. An association invoking such representational standing "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734-41 (1972)); *see also Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 18 CIT 754, 758, 861 F. Supp. 121, 126-27 (1994) (holding that an association of licensed customs brokers has standing to challenge an interim Customs regulation allowing consignees to make informal entry of certain low value merchandise).

The complaint alleges that "SEAI is an association that represents member companies who are exporters and U.S. importers of seafood products from India, including shrimp that is subject to an antidumping duty order on certain frozen warmwater shrimp from India." First Am. Compl. ¶ 1. The complaint, however, does not allege specifically that any member of SEAI is a shrimp importer to which the Bond Directive, as modified by the Amendment, has actually been applied. Instead, the complaint vaguely asserts that unspecified "importers" have been required to obtain new continuous entry bonds as a result of application of the Amendment but does not state that those importers are included among the SEAI membership. *Id.* ¶ 9. Compounding the vagueness of the complaint on this point is the allegation therein that "the member companies of SEAI, their affiliated and unaffiliated U.S. importers, and GFF and ICF are 'adversely affected or aggrieved' by the unauthorized and unlawful actions of CBP in requiring increased continuous entry bonds pursuant to the Bond Directive." *Id.* (quoting 5 U.S.C. § 702 and 28 U.S.C. § 2631(i)). This statement leaves open to question whether the importers that are SEAI member companies are actually importers that would have standing to challenge the amended Bond Directive as applied.

The issue presented by the vagueness in plaintiffs' pleading is whether the complaint has alleged sufficient facts from which the court could infer an injury in fact to the members of SEAI that are importing shrimp subject to the antidumping duty order, such that at least one of these SEAI members would have standing to sue individually. The court infers, from the complaint as a whole, allegations of injury to one or more members of SEAI, based on allegations in the complaint that "plaintiffs" suffered and continue to suffer from higher bond premiums, increased collateral requirements as high as 100 percent, and the loss of business. *See id.* ¶¶ 19-20, 22. This inference is consistent with defendants' own submission, which admits additional facts.

Defendants in their reply brief, making an apparent reference to Customs, state that "based upon our examination of the attachment to the amended complaint [listing SEAI's member companies], we have ascertained that the Seafood Exporters Association of India ("SEAI"), although principally an association of exporters, has seven members who are importers whose bonds Customs has determined to be insufficient."  Defs.' Reply Br. 4.  The court concludes that SEAI has met the requirement of alleging "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  *Warth*, 422 U.S. at 511.

Plaintiff association SEAI, seeking to sue on behalf of its members, also must show that the interests that the association seeks to protect are germane to the association's purpose.  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  The court readily can infer from the complaint that SEAI is a trade association that exists to promote the business of its member exporters and importers and that it is suing to protect interests germane to its purpose; *i.e.*, the interests of its members in exporting and importing without the encumbering effects alleged to result from the application of the Bond Directive.  *See* First Am. Compl. ¶ 1 (stating that SEAI represents member companies who are both exporters and U.S. importers of shrimp that is subject to the antidumping duty order on certain frozen warmwater shrimp from India); *see also id.* ¶ 10 (stating that trade associations representing interests of members have standing under 28 U.S.C. § 2631(i) and that SEAI accordingly has standing).

Finally, plaintiff association SEAI must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt*, 432 U.S. at 343; *see also Warth*, 422 U.S. at 515 ("whether an association has standing to invoke the court's

remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought."). Thus, "[t]he organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof[.]'" *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (quoting *Warth*, 422 U.S. at 515-16). The organization also lacks standing "where 'the relief requested [would] require[] the participation of individual members in the lawsuit[.]'" *Id.* (quoting *Hunt*, 432 U.S. at 343); *see also Warth*, 422 U.S. at 515-16 (holding that the association of home builders lacked standing to seek relief in damages for alleged injuries to its members because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof."). In contrast, where the organization seeks a purely legal ruling and equitable relief that does not require individualized proof of the facts as to the merits or the damages sustained, the association has standing. *See Bano*, 361 F.3d at 714.

Defendants, citing *Nat'l Fisheries Inst. Inc.*, 30 CIT __, Slip Op. 06-166, argue that SEAI lacks standing because "significant importer participation may indeed be necessary" to the resolution of this case. Defs.' Resp. to Pls.' Surreply 4. In *Nat'l Fisheries Inst. Inc.*, in which plaintiffs challenged the same Bond Directive at issue in this case, the court considered individualized proof to be necessary to a showing of irreparable harm for purposes of preliminary injunctive relief. *Nat'l Fisheries Inst. Inc.*, 30 CIT at __, Slip Op. 06-166 at 40 (declining to infer irreparable harm and therefore denying the motion for preliminary injunctive relief as to those plaintiffs that did not present evidence in the court's hearing on the motion and instead relied on the limited showing made in their pleadings). Plaintiffs in this case, however, do not seek a

preliminary injunction. Instead, as discussed previously, plaintiff association SEAI, like its co-plaintiffs, seeks declaratory relief that the amended Bond Directive, by itself and as applied, is contrary to law, and permanent injunctive relief against the application of the amended Bond Directive by Customs. First Am. Compl. 14. Many issues pertaining to whether, and on what grounds, the amended Bond Directive is contrary to law may be adjudicated on the agency record according to the "arbitrary and capricious" standard of review as provided for by 28 U.S.C. § 2640(e) and 5 U.S.C. § 706(2)(A). Based on the claims plaintiffs have asserted and the nature of the relief they are seeking, the court concludes that neither these claims nor the form of relief sought by plaintiffs *necessarily* requires the participation of individual SEAI members.

In challenging the standing of SEAI, defendants argue in the alternative that while plaintiff SEAI might meet the representational standing requirements as to those members who are importers, "SEAI may not leverage its importer members' standing into a general representation of its exporter members, where those members themselves lack standing." Defs.' Reply Br. 9. An association, however, satisfies the representational standing requirements as long as one of its members would have standing to bring the lawsuit in its own right. *Hunt*, 432 U.S. at 342; *Warth*, 422 U.S. at 511. SEAI has satisfied those requirements by showing that one or more of its members would have had such standing. Therefore, defendants' argument in the alternative does not establish that the court may refuse to recognize the representational standing of SEAI.

### III. CONCLUSION AND ORDER

For the reasons discussed above, the court concludes that jurisdiction exists over the subject matter of this action and, specifically, that plaintiffs have demonstrated that their claims are ripe for judicial review. Plaintiffs also have demonstrated that they have standing to bring this

action.  Accordingly, upon consideration of defendants' motion to dismiss this action pursuant to USCIT Rule 12(b)(1), for lack of subject matter jurisdiction, and USCIT Rule 12(b)(5), for failure to state a claim upon which relief can be granted, plaintiffs' response thereto, and all other submissions and proceedings herein, it is

       **ORDERED** that defendants' motion to dismiss be, and hereby is, DENIED.


                                   /s/ Timothy C. Stanceu
                                   Timothy C. Stanceu
                                   Judge

Dated: March 13, 2007
       New York, New York